[L.A. No. 29799. In Bank. May 17, 1971.]

HAROLD CORWIN et al., Plaintiffs and Appellants, v.
LOS ANGELES NEWSPAPER SERVICE BUREAU, INC., et al.,
Defendants and Respondents.

844

## COUNSEL

Darling, Hall, Rae & Gute, Darling, Mack, Hall & Call and John R. Shiner for Plaintiffs and Appellants.

Robert F. Tyler for Defendants and Respondents.

## OPINION

**SULLIVAN, J.**—In this antitrust case, plaintiffs Harold Corwin and Allen Barr, doing business as Statewide Publication Service (Statewide), appeals from a summary judgment in favor of defendant Los Angeles Newspaper Service Bureau, Inc. (Bureau) and 40 of its member newspapers also joined as defendants. As will appear, we have concluded that upon the record presented the summary judgment was erroneously granted and should be reversed.

Statewide, a partnership formed in 1966, operates a publication service and legal advertising business dealing almost exclusively with notices of sales by trustees under deeds of trust. Generally speaking, Statewide solicits,

services and places the notices of trustee sales for publication in newspapers. Its services include proofreading the notices, verifying legal descriptions of the subject property and checking the affidavits of publication. When Statewide places a legal advertisement with a newspaper, it pays the paper's publication charges and then obtains reimbursement from the trustee. Although it has no formal contract with any newspaper, Statewide seeks a commission from them in the amount of 15 percent of the cost of the publication.

Defendant Bureau was organized in 1934 to enable newspapers in Los Angeles County to acquire a share of the legal advertising market which until that time had been effectively monopolized by the Consolidated Printing and Publishing Company. Membership in the Bureau is open to any fully adjudicated legal newspaper in the county. From an original membership of 33 newspapers, the Bureau has grown to include 111. In 19 of the 26 judicial districts in the County of Los Angeles, every newspaper qualified to print legal advertisements is a member of the Bureau.

Each member newspaper executes with the Bureau a written contract entitled a "Representation Agreement" designating the Bureau its representative in soliciting and servicing all classes of legal advertising. Under paragraph Eighth of the contract the member agrees to pay the Bureau a 15 percent commission on each legal advertisement published by the newspaper, whether or not the particular advertisement was placed by the Bureau.[1] In return the contract provides that each member shall own one share of stock in the Bureau and shall be entitled to an annual pro-rata distribution of the Bureau's net profits. The profits are divided among the member on the basis of each member's contribution to the total commissions paid to the Bureau during the year. In addition, each member of the Bureau is entitled to make use of all the services performed by the Bureau.

Each member reserves the right to withdraw from the agreement any class of legal advertising. However, the contract provides in paragraph

---

[1]Paragraph Eighth provides in relevant part: "The BUREAU shall and it is hereby authorized to deduct, as compensation for its services, fifteen (15%) per cent of all sums collected for the account of the PUBLISHER. . . . In the event any sums are paid directly to the PUBLISHER for any advertisements covered by this agreement, the PUBLISHER shall render a true and correct account thereof to the BUREAU and shall pay to the BUREAU within thirty days after receipt of said sums, a sum equal to fifteen (15%) per cent of the amount paid to the PUBLISHER." With reference to this paragraph of the contract, Telford Work, Secretary-Treasurer of the Bureau, in his affidavit in support of the motion for summary judgment, states: "Advertisers are of course free to go directly to the newspaper and place their legal advertising as many do, just as any other members of the general public also do, and there is no prohibition of any kind against this. However, the BUREAU under its representation agreements would still be entitled to its 15% commission."

Second[2] that if the newspaper exercises such withdrawal privilege, it waives all right to participate in the annual distributions of the Bureau's net profits. This waiver extends not only to profits derived from classes of legal advertising which the member has excluded from his contract, but also to profits arising from nonexcluded classes of advertising.[3] The agreements have a term of three years and are renewed automatically unless, prior to expiration of a term, the newspaper indicates in writing its intent not to renew.

The Bureau processes all form of legal advertising including notices of trustee's sales, certificates of fictitious names, probate notices, tax sale lists, and solicitations for bids for government contracts. It works with the advertiser to make sure that the notice is properly phrased in accordance with applicable statutes and to ascertain which newspapers are qualified to carry the particular advertisement. It also proofreads the advertisement and checks legal descriptions and affidavits of publication. The Bureau bills the advertisers on behalf of its member newspapers and remits the proceeds, minus its commission, to each newspaper at the end of the month. If an advertiser fails to pay, the Bureau absorbs the loss.

In addition to its services in processing legal advertisements, the Bureau also acts as a representative for its member newspapers in the area of public relations and public law. It maintains for its members a compendium of the more than 2,000 statutes governing the various types of legal advertisements and renders expert assistance to its members in complying with those statutes. It also acts as a lobbyist for its newspapers in seeking changes in legal publication statutes, and it contributes support to other newspaper associations representing publishers on a statewide level.

---

[2]Paragraph Second provides in relevant part: "The PUBLISHER hereby retains the services of the BUREAU as representative of the PUBLISHER for soliciting and servicing of all legal advertising . . . provided, however, the PUBLISHER reserves the right to withdraw, at any time by notification in writing to the BUREAU, from the terms of this agreement, the following classes of legal advertising: _____. [Par.] In the event the PUBLISHER exercises the withdrawal privilege herein contained, PUBLISHER agrees to and does hereby waive during the period of such withdrawal the right to participate in the distributions and/or credits contemplated under paragraph Ninth hereof." Paragraph Ninth provides for the annual pro-rata distributions of the Bureau's profits as discussed above.

[3]In its supplemental brief filed in this court, the Bureau, for the first time herein, contends that while the literal language of the contract appears to dictate the total waiver of any right to profits as stated above, the actual practice has been to allow member newspapers which have excluded certain classes of legal advertising from their contract to participate in the distribution of net profits to the extent of the commissions they paid to the Bureau on nonexcluded classes. Since no such facts appear in the record, we cannot now consider this contention. However, to the extent that such facts are relevant, they may be proved at trial.

While both the Bureau and Statewide operate as middlemen between legal advertisers and newspapers, the Bureau is primarily a representative of the newspapers and provides various services for their benefit. Statewide, on the other hand, primarily represents the trustees. Nevertheless, in the relatively narrow area of publication of notices of trustee's sales, their businesses are essentially identical. Both place notices of sale in the appropriate newspapers and post the notices on the premises; both proofread the notices, check the legal descriptions and the affidavits of publication. Each organization bills the advertiser and pays the newspaper for its publication costs.

In general, newspapers which belong to the Bureau have refused to pay Statewide any commission or have paid only a small commission on advertisements placed with them, because of their contractual commitment to pay the Bureau a 15 percent commission on all advertising they publish, regardless of its source. Members are understandably reluctant to pay the double commission which would result if they also paid Statewide for the advertising it furnishes. Consequently, whenever possible Statewide patronizes papers which are not members of the Bureau, but often it must place advertising with members because they are the only newspapers qualified to print the advertisement, the only newspapers printed frequently enough to carry it, or the only newspapers acceptable to the trustee.

Statewide commenced the instant action against the Bureau and 40 of its members[4] charging that the representation agreements between the Bureau and defendant publishers were entered into as part of a common plan and conspiracy violative of the Cartwright Act. (Bus. & Prof. Code, § 16700 et seq.)[5] Statewide asserts two bases for this claim: First, it contends that the agreements constitute a combination of capital, skill or acts to restrict trade in the soliciting and servicing of the publication of notices of trustee's sales in violation of sections 16720 and 16726. This restraint of trade is said to flow from two clauses of the contract—paragraph Eighth (see fn. 1, *ante*) which provides that the member newspapers must pay the Bureau a 15 percent commission for every legal advertisement whether or not placed by the Bureau—and paragraph Second (see fn. 2, *ante*), which provides that members waive all rights to distribution of the Bureau's profits if they exclude any category of legal advertising from the contract. Second, Statewide argues that paragraph Second itself is a tying arrangement constituting a per se violation of sections 16720 and 16726. Statewide seeks three times the amount of its actual damages of $15,586.29 plus attorney's

---

[4]The only member newspapers named as defendants in the complaint are those which publish in judicial districts in which every newspaper qualified to carry legal advertisements is a member of the Bureau.

[5]Hereafter, unless otherwise indicated, all section references are to the Business and Professions Code.

fees and costs. It also prays for an injunction forbidding defendants from enforcing or complying with their representation agreements and a declaration that the agreements are void as contrary to public policy, and that defendant publishers are not legally obligated to pay any commission to the Bureau for advertisements placed by Statewide.

Defendants demurred to the complaint and also moved for summary judgment. In support of the motion they filed two declarations of the secretary-treasurer of the Bureau; in opposition to the motion, Statewide filed a declaration of plaintiff Allen Barr. After examining the declarations, which state the facts set forth above, the trial court granted defendants' motion for summary judgment, at the same time ordering the demurrer off calendar. Judgment was entered accordingly. This appeal followed.

We have summarized on a number of occasions the well-established rules governing summary judgment procedure. (Code Civ. Proc., § 437c.) "The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor[6] and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of

---

[6]"We first consider the affidavits of the moving party. They 'must contain facts sufficient to entitle . . . defendant to a judgment in the action. . . .' (Code Civ. Proc., § 437c.) To prevail, therefore, such affidavits 'must state facts establishing every element necessary to sustain a judgment in his favor.' [Citation.] Such facts 'shall be set forth with particularity' (Code Civ. Proc., § 437c) and shall be within the personal knowledge of the affiant, the affidavit to show that the affiant, if sworn as a witness, can testify competently thereto. As the court stated in *House* v. *Lala, supra,* [180 Cal. App.2d 412 (4 Cal.Rptr. 366)] '[t]o satisfy the statutory requirement of "particularity," the movant's affidavits must state all the requisite evidentiary facts and not merely the ultimate facts. [Citations.] Moreover, neither conclusions of law nor conclusions of fact are sufficient to satisfy the statutory requirement. [Citation.]' " (*Snider* v. *Snider* (1962) 200 Cal.App.2d 741, 748-749 [19 Cal.Rptr. 709].)

"It is therefore well settled that summary judgment cannot be ordered for the moving party, even though the affidavits of the opposing party be insufficient or absent, unless the moving part presents affidavits in support of his motion which comply with the statute and show that he is entitled to judgment. [Citations.] As is stated in *Southern Pacific Co.* v. *Fish, supra,* [166 Cal.App.2d 353 (333 P.2d 133)] 'there first must be a *sufficiently supportive affidavit* before the defects of any counteraffidavit, either of form or substance, need be examined; . . .' " (Original italics; *de Echeguren* v. *de Echeguren* (1962) 210 Cal.App.2d 141, 147 [26 Cal.Rptr. 562].)

granting the motion should be resolved in favor of the party opposing the motion. ■ Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts." (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 [42 Cal.Rptr. 449, 398 P.2d 785]; see *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 146-148 [60 Cal.Rptr. 377, 429 P.2d 889].)

■ In addition, the United States Supreme Court has observed that a summary judgment in favor of defendants is rarely warranted in antitrust cases. "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.' " (Fn. omitted.) (*Poller* v. *Columbia Broadcasting* (1962) 368 U.S. 464, 473 [7 L.Ed.2d 458, 464, 82 S.Ct. 486]; quoted with approval in *Fortner Enterprises* v. *U.S. Steel* (1969) 394 U.S. 495, 500 [22 L.Ed.2d 495, 503, 89 S.Ct. 1252].)

Our task is to determine whether under these rules the declaration filed below disclose a triable issue of fact. However, we must first examine the legal underpinnings of the cause of action.

■ Sections 16720 and 16726 of the Cartwright Act[7] were patterned after the Sherman Act (15 U.S.C. § 1 et seq.) and decisions under the latter act are applicable to the former. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 315 [70 Cal.Rptr. 849, 444 P.2d 481].) Both acts codify the general common law prohibition against restraints of trade. ■ Section 16727 goes beyond the common law to interdict certain practices which have a tendency to lessen competition or promote monopolization.[8] This section, enacted in 1961 (Stats.

[7]Section 16720 provides in relevant part: "A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes: [Par.] (a) To create or carry out restrictions in trade or commerce. . . ." Section 16726 provides: "Except as provided in this chapter, every trust is unlawful, against public policy and void."

[8]Section 16727 provides in relevant part: "It shall be unlawful for any person to . . . make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the . . . purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor . . . where the effect of such . . . sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State."

1961, ch. 738), is based on section 3 of the Clayton Act (15 U.S.C. § 14). Hence, federal decisions interpreting section 3 are applicable to section 16727. (69 Cal.2d 305, 315.)

 Although the Sherman Act and the Cartwright Act by their express terms forbid all restraints on trade, each has been interpreted to permit by implication those restraints found to be reasonable. (*Standard Oil Co.* v. *United States* (1911) 221 U.S. 1, 60 [55 L.Ed. 619, 645, 31 S.Ct. 502]; *People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 727 [264 P.2d 31].) "However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. . . . Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing [citation]; division of markets [citation]; group boycotts [citation]; and tying arrangements [citation]." (*Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].)

 Statewide's first claim—namely, that the representation agreements constitute an illegal restraint of trade—does not rely on an assertion that the agreements involve any of the practices deemed illegal per se. Accordingly, in order for Statewide to prevail in this contention, it must appear from the record not only that the agreements "create or carry out restrictions in trade" (§ 16720, subd. (a)) but also that such restrictions are unreasonable.[9]

 Defendants admit, as they must, that the representation agreements[10] involve some restraints of trade. As we noted above, paragraph Eighth of the agreement provides that the member newspapers must pay the Bureau a 15 percent commission on all legal advertising published,

---

[9]Defendants contend that Statewide has no standing to raise these claims because it does not compete with the Bureau and has therefore suffered no injury as a result of whatever restrictions in trade the agreements may generate. While it is true that Statewide does not offer to represent newspapers in the same manner as the Bureau, our summation of the facts demonstrates that in the area of publication of notices of trustee's sales, Statewide and the Bureau offer nearly identical services. Since they compete in the latter area, Statewide has standing to sue.

The Bureau also claims that Statewide has suffered no injury because its members were never under any obligation to pay commissions to Statewide. Statewide replies that the newspapers have a customary and quasicontractual duty to pay such commissions. These opposing arguments cannot be resolved on the basis of the declarations on file.

[10]A facsimile of the agreement has been attached as an exhibit to, and made a part of, the Bureau's declaration in support of its motion as well as Statewide's declaration in opposition to the motion. Thus, the terms of this document are undisputed.

whether or not it was solicited, placed or serviced by the Bureau. Statewide asserts, and defendants do not deny, that as a result of this provision it is economically infeasible for the Bureau's member newspapers to pay independent agencies such as Statewide the normal 15 percent advertising commission. Member newspapers may occasionally pay Statewide and similar agencies a fraction of their normal commissions, but no newspaper could afford consistently to pay a total of 30 percent commissions (15 percent to the Bureau and 15 percent to the independent agency). Since Statewide cannot obtain the normal 15 percent commission from member newspapers, it is forced either to accept a reduced profit level or to charge its clients, the trustees, a higher fee. The more Statewide is compelled to charge its clients, the less able it will be to compete for their business. Clients will naturally gravitate to the Bureau, which can charge a lesser fee. Thus, the effect of paragraph Eighth is to reduce the profit margin and competitive strength of independent agencies such as Statewide.

Paragraph Second of the Bureau's contracts (see fn. 2, *ante*) also imposes a restraint upon trade. By prohibiting *all* participation in the Bureau's distribution of profits if a member withdraws *any* class of advertising from the agreement, this provision severely penalizes a member newspaper which wishes to have a different representative or none at all for specified classes of legal advertising. Obviously, this penalty thwarts the exercise of the very privilege of withdrawal which the agreement feigns to confer. By so doing, paragraph Second forces independent agencies to compete, if at all, for representation with regard to all classes of legal advertising, rather than for representation with regard to individual classes of advertising. This increase in the categories of services which a competitor must offer impedes and discourages the entry of others into the market.

Since the agreements between the Bureau and its member newspapers constitute a restraint upon trade, they violate the Cartwright Act unless they are shown to be reasonable. To determine whether the restrictions are reasonable, "the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts." (*Chicago Board of Trade* v. *United States* (1918) 246 U.S. 231, 238 [62 L.Ed. 683, 687, 38 S.Ct. 242].) The court should consider "the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize. . . ." (*United States* v. *Steel Co.* (1948) 334 U.S. 495, 527 [92 L.Ed. 1533, 1554, 68 S.Ct. 1107]; quoted with approval in *Times-*

*Picayune* v. *United States* (1953) 345 U.S. 594, 615 [97 L.Ed. 1277, 1293, 73 S.Ct. 872].) Whether a restraint of trade is reasonable is a question of fact to be determined at trial. (*Times-Picayune* v. *United States, supra; Chicago Board of Trade* v. *United States, supra; Winn Ave. Warehouse, Inc.* v. *Winchester Tobacco Ware. Co.* (6th Cir. 1964) 339 F.2d 277, 280; *Rogers* v. *Douglas Tobacco Board of Trade, Inc.* (5th Cir. 1959) 266 F.2d 636, 643, cert. den. (1959) 361 U.S. 833 [4 L.Ed.2d 75, 80 S.Ct. 85].)

 This general rule is particularly appropriate in the instant case. Here, the Bureau contends that any restraint is, at worst, *de minimis* because the relevant line of commerce is the solicitation, placement and service of *all* classes of legal advertisements. Statewide, however, argues that the relevant line of commerce, as defined by the cross-elasticity of demand, is the solicitation, placement and service *only* of notices of trustee's sales. Obviously, the restraint imposed by the Bureau's agreements has far greater impact in the market delineated by Statewide than in the market outlined by defendants. The definition of a relevant market or line of commerce presents a difficult question of law and fact which cannot properly be resolved on the basis of the limited record now before us.

The Bureau also argues that whatever restraining effect its agreements may have is justified by the fact that the Bureau provides services such as lobbying for which it cannot charge directly. This contention is partially contradicted by the Bureau's own brief, which states that "if the Bureau did not use the 15% commission method to pay its costs of operation, it would have to use some other method such as outright assessment of dues." The brief further asserts: "It is also true that the Bureau must have some means of remuneration to pay its costs. It could resort to a special assessment against all newspapers; it could resort to annual dues; or it can as here, use a system of commissions. . . ." If a less restrictive means can be used to recompense the Bureau for services such as lobbying, clearly the provision of those services cannot justify the restraints imposed by the present agreements. Whether less restrictive means are available and whether provision of services such as lobbying justifies the present restraints are questions of fact which should not have been decided upon a motion for summary judgment.[11]

---

[11]The Bureau also contends that any restrictive effect arising from its agreements is caused by the legally sanctioned monopoly held by newspapers qualified to publish legal advertisements. As we have seen, however, the restrictive effect flows from the terms of the agreements themselves, and not from the statutes governing "newspapers

Therefore we conclude that with respect to Statewide's general claim that the Bureau and its members have conspired and combined to restrict trade, there are presented several triable issues of fact which preclude entry of summary judgment.

We now turn to examine Statewide's second and more particularized challenge to the representation agreement. In essence Statewide claims that paragraph Second (see fn. 2, *ante*) of the agreement (which provides that a member's withdrawal of any class of legal advertising from the terms of the agreement shall constitute a waiver, during the period of withdrawal, of the right to participate in the distribution of the Bureau's profits), constitutes a tying arrangement violative of sections 16720 and 16726.[12]

"For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier. Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' [Citation.] They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power of leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' [Citation.]" (Fns. omitted.) (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. 1, 5-6 [2 L.Ed.2d 545, 550].) Tying arrangements are illegal per se "whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product" (*Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. at p. 6 [2 L.Ed.2d at p. 550]; *Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. 495, 499, 503 [22 L.Ed. 2d 495, 502, 505]) and when "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is fore-

of general circulation" within the meaning of the Government Code. (Gov. Code, §§ 6000-6078.)

The further argument that the contract provisions are justified because they allow the Bureau to act as a clearing house for legal notices in the County of Los Angeles again presents a question of fact which should be determined at trial.

[12]Since we find that there are triable issues of fact as to whether the representation agreements are tying arrangements violative of sections 16720 and 16726, we need not determine whether the agreements also independently violate section 16727.

closed to competitors by the tie. . . ." (*Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. at p. 501 [22 L.Ed.2d at p. 504].)

 After reviewing the declarations of the parties, we are satisfied that triable issues have been raised, which, if resolved in Statewide's favor, will establish a tying arrangement condemned by the above decisions. Indeed, as we have already pointed out, the Bureau itself as the moving party incorporated the representation agreement in its own supporting declaration, thereby exposing the ingredients of a tying arrangement which are inherent in paragraph Second. Consequently, it was incumbent upon the Bureau to show that this apparently illegal restraint did not in fact constitute a violation of the Cartwright Act, since there must first be a sufficient supportive affidavit in order that the party moving for summary judgment may prevail. (See fn. 6, *ante,* and accompanying text.) In addition, Statewide's declaration in opposition clearly raises triable issues of fact.

In this case, the "tie" arises from paragraph Second of the agreement which provides that if a member exercises its privilege of withdrawing one or more classes of advertising from the agreement, it waives, during the period of withdrawal, any right to participate in the annual pro-rata distributions of the Bureau's net profits. As we have noted above, the waiver extends not only to profits derived from the class or classes of advertising which are excluded, but also to profits arising from all nonexcluded classes. Since a member which exercises its withdrawal privilege must pay the same commission on nonexcluded classes, but is not entitled to distributions of profit, it must, in effect, pay more than is paid for the same services by newspapers which do not exclude any class of advertising. This increase in price for services on nonexcluded classes operates as a powerful economic incentive against exercise of the withdrawal privilege. Thus paragraph Second ties the services rendered by the Bureau with regard to any one class of advertising to the services rendered with regard to all other classes of legal advertising.[13]

On the record before us, it is beyond dispute that the Bureau provides unique and extensive services to an imposing array of newspapers in Los

---

[13]However, we deem it unnecessary to determine whether this tying effect is sufficient to bring the agreement within the per se rule established by the United States Supreme Court cases cited above. Most cases involving tying arrangements have dealt with situations where the seller absolutely refused to sell one product separately from another. Here, there is no such refusal, but a higher price is exacted for the tying product if the tied product is not also purchased. Such an arrangement appears to present many of the same evils inherent in a classic tying arrangement within the prohibition of section 16726. (*Federal Trade Com'n* v. *Paramount Famous-Lasky Corp.* (2d Cir. 1932) 67 F.2d 152, 155; *Washington Gas Light Co.* v. *Virginia Electric & Power Co.* (E.D.Va. 1970) 309 F.Supp. 1119, 1125: Turner, *The Validity of Tying Arrangements Under the Antitrust Laws* (1958) 72 Harv.L.Rev. 50, 65-73.)

Angeles County. As we have set forth in some detail, it processes all forms of legal notices for publication, acts as the publishers' representative in the areas of public relations and public law, offers expert supervision of compliance with pertinent statutory requirements, functions as a lobbyist for its members and even provides assistance to newspapers on a statewide basis. Since the Bureau is unique in providing this varied and comprehensive service, we are satisfied that it has sufficient economic power to restrain competition appreciably.

■■■ Decisions of the United States Supreme Court "have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. . . . 'Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.' [Par.] These decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally serve no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidating the tie. Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market." (*Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. at pp. 502-503 [22 L.Ed.2d at pp. 504-505].)

■■■ The Bureau asserts that its agreements cannot be illegal tying arrangements because it sells only a single, unitary service. ■■■ This argument raises the difficult question whether this case "should be treated as a case of tying the sale of one product to the sale of another product or merely as the sale of a single product. . . . The facts must be examined to ascertain whether or not there are legitimate reasons for selling normally separate items in a combined form to dispel any inferences that it is really a disguised tie-in." (Fns. omitted.) (*United States* v. *Jerrold Electronics Corporation* (E.D.Pa. 1960) 187 F.Supp. 545, 559; affd. per curiam *sub. nom. Jerrold Electronics Corp.* v. *United States* (1961) 365 U.S. 567 [5 L. Ed.2d 806, 81 S.Ct. 755]; see *Times-Picayune* v. *United States, supra,* 345 U.S. 594 [97 L.Ed. 1277, 73 S.Ct. 872] and *Associated Press* v. *Taft-Ingalls Corporation* (6th Cir. 1965) 340 F.2d 753, 759-766, cert. den. (1965) 382 U.S. 820 [15 L.Ed.2d 66, 86 S.Ct. 47].) Although we have not found, nor has our attention been directed to, any definitive test for the determination of this question, the following factors should be taken into account: (1) Whether competitors offer to sell the products or services separately or only

as a unit. (2) Whether the combined product or service is composed of varying assortments of component parts. (3) Whether buyers are or can be charged separately for the allegedly separate products or services. (4) Whether the defendant ever sells or offers to sell the products or services separately. (*United States* v. *Jerrold Electronics Corporation, supra; Associated Press* v. *Taft-Ingalls Corporation, supra,* 340 F.2d 753, 764.)

 The question whether the processing of legal advertising by the Bureau is a single product of which the servicing of trustees' notices is a part, or whether the latter service is a separate product which is tied to the others, is one of fact to be determined in the light of the particular circumstances. We cannot say as a matter of law on this record that it is not a tied product and we think that this must remain an issue to be resolved at trial.[14]

In summary we conclude that Statewide is entitled to a trial not only on its general theory of a conspiracy and combination in restraint of trade (§§ 16720, 16726), but also on its more particularized claim of a tying arrangement illegal per se under those sections.

The judgment is reversed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

Respondents' petition for a rehearing was denied June 16, 1971.

---

[14]We also note that it will be necessary for the trial court to determine the dollar-volume of business foreclosed by any tying arrangement which it may find inherent in paragraph Second. (See *Fortner Enterprises* v. *U.S. Steel, supra,* 394 U.S. 495, 501 [22 L.Ed.2d 495, 503].) The declarations filed in this case are of no assistance on this vital issue.