[Civ. No. 21580. Fourth Dist., Div. Two. Oct. 28, 1980.]

CALVA PRODUCTS et al., Plaintiffs and Appellants, v.
SECURITY PACIFIC NATIONAL BANK,
Defendant and Respondent.

COUNSEL

Mallery & Stern and Jon A. Kodani for Plaintiffs and Appellants.

Butterwick, Bright, Pettis & Cunnison and J. D. Butterwick for Defendant and Respondent.

OPINION

TAMURA, J.—Plaintiffs (Calva and Chase) brought an action against Security Pacific National Bank (Security Pacific) and other named and unnamed defendants for damages for conversion of 900 head[1] of plain-

---

[1]The figure "900" alleged in the complaint is inexplicable, since the record shows that the bank sold only circa 300 cows to satisfy its demand for loan repayment.

tiffs' cattle. The trial court granted Security Pacific's motion for a summary judgment and plaintiffs appeal from the ensuing judgment. The principal issue concerns the constitutionality of Civil Code section 2980.5 requiring the recordation of bailment and feeding contracts for dairy cattle.

The record on appeal reveals the following facts:

Early in 1972 Evan and Janice Tiss, owners of Tiss Farms,[2] applied to Security Pacific for a loan to finance the purchase of day-old dairy calves to be raised by them for sale as replacement animals for dairy herds. The Tisses originally applied for a $5,000 line of credit which was gradually increased to $40,000 as they built up their herd. As collateral for the loan, the Tisses executed a security agreement encumbering their livestock and farming equipment. The agreement specifically included "[a]ll livestock now owned or hereafter acquired by Debtor includng but not limited to those located on the Tiss Ranch, 36980 Los Alamos Rd. Murrieta, Calif. (Riverside County) including that certain herd of 25 cattle and all increases thereof." Evan Tiss and Security Pacific also executed a financing statement specifically covering all livestock then owned or thereafter to be acquired by Tiss. The financing statement was duly filed with the Secretary of State pursuant to the California Uniform Commercial Code.

In early 1973 Calva, a corporation engaged in calf raising, entered into a letter agreement with Tiss Farms under which the Tisses would raise calves for Calva for a fixed fee for each animal.[3] The calves were purchased by one of Calva's purchasing agents, delivered to Tiss Farms to be raised, and picked up by Calva when they had reached an agreed-upon weight. At approximately the same time, Chase, a corporation engaged in the dairy business and in raising dairy cattle, began

---

[2]Evan and Janice Tiss and Tiss Farms were named defendants in plaintiffs' suit but did not answer or appear in the action.

[3]The Tiss/Calva letter agreement provided in pertinent part: "AGREEMENT

"This agreement is entered into between Tiss Farms, Inc. and Calva Products Co., Inc.

"Calva Products is to purchase and provide Tiss Farms with a number of Holstein Heifer calves. Tiss Farms agrees to accept the responsibility to raise these animals to a weight of 180 lbs. for a fee of $60.00 per animal. Tiss Farms further agrees to assume any and all the mortality in connection with the raising of above described animals.

"Calva Products will assume the responsibility for and provide transportation for the grown animals as mentioned in the agreement. (Grown animal shall be for purposes of this agreement, animals that have attained a weight of 180 lbs.). Tiss Farms will provide and Calva will accept only healthy, well marked animals. It is also agreed that

similar business dealings with Tiss. As explained in a deposition by Glyn Sunley Chase, Jr., President of Chase, "[o]ur deal with him was us buying—he would buy calves for us and we have the choice of either paying him or paying the people he bought them from. Then he would raise them and then we would pay him a certain price for them. I believe it was 175 to 200 pounds." Chase and Tiss entered a written agreement setting out the terms of their contract.[4] Neither Calva nor Chase recorded the agreements with Tiss.

In July of 1973, Security Pacific learned from Wells Fargo Bank that approximately 340 of the 650 calves on the Tiss property were actually owned by the Tule Cattle Company. When confronted with this knowledge, Evan Tiss admitted that he had misrepresented the size of his herd and that Tule Cattle Company did own the 340 calves. Because of the misrepresentation, the fact that the collateral had been rendered inadequate as a result of its discovery, and concern about the possibility that Tiss would improperly care for the remaining herd or abandon his operation, Security Pacific decided to call in its loan immediately, and to take possession of the cattle and liquidate the herd if payment were not forthcoming.

Security Pacific experienced some difficulty in selling the calves on the market because of their condition. On July 19, 1973, it sold the herd to Tule Cattle Company for $17,500. A balance of $22,500 remains owing on the Tiss loan. Sometime during the sale period, either

---

Calva will not be required to accept crippled animals. Time is of essence and the growing time shall not exceed one-hundred (100) days for each calf.

"Payment is to be made by Calva Products within seven (7) days after animals are picked up at Tiss Farms. For purposes of this agreement proof of delivery will be a shipping tag acknowledging receipt of animals.

"Date:                                                    [s]  Ed P. Gillespie
"March 1, 1973                                               Calva products
                                                         [s]  Evan Tiss
                                                              Tiss Farms        "

[4]The Tiss/Chase written agreement provided in pertinent part: "60 calves per month start

"Chase Bros to pay cost of calf each week either to B & G Cattle or to *Tiss Farms* on billing.

"Tiss Farms to stand all death loss.

"Tiss Farms to feed and raise calf to 175-200 # for delivery every 2 weeks (30).

"Purchase price to be .90 per pound less amount paid for calf purchase price to be adjusted at any time according to market.

"Tiss Farms now receives .05 pound over cost of calf

"Example: $85.00 calf sale price .90 per pound.

"Price is F.O.B. Tiss Farms Murrieta.

"Chase Bros. can pick choice of calfs [*sic*] each week."

just before or just after the sale to Tule Cattle Company, both Calva and Chase contacted Security Pacific to inform the bank that they owned cattle on the Tiss property.

Calva and Chase brought the instant action for conversion of the herd left on the Tiss property. Security Pacific moved for summary judgment supported by a number of documents—declarations by two bank officials and the bank's attorney and documents supporting these declarations including the depositions of the presidents of both Calva and Chase and the written agreements between Calva and Tiss, and Chase and Tiss. In its points and authorities, Security Pacific argued that the facts were undisputed that both Calva and Chase had cattle on the Tiss property pursuant to contracts for the feeding of dairy cattle, that the contracts had not been recorded, and that consequently Security Pacific's interest in the cattle as a bona fide encumbrancer prevailed over Calva's and Chase's ownership interest in the cattle under Civil Code section 2980.5.[5] Plaintiffs presented counterdeclarations and argued that triable issues of fact existed which precluded the granting of summary judgment on their suit. The motion was granted and judgment entered for defendant.

---

[5]Civil Code section 2980.5 provides: "(a) As used in this section 'contract' means any agreement, other than one intended to create a security interest (Section 9102(1)(a) of the Uniform Commercial Code), for the leasing of livestock or other animate chattels, or any agreement for the bailment or feeding of cattle of such breeds or cross-breeds as are primarily used for the production of milk for human consumption (hereinafter termed 'dairy cattle'); 'lessor' means the lessor of any such chattels, or the bailor or person owning dairy cattle under a feeding agreement; 'lessee' means the lessee of any such chattels or the bailee or person feeding dairy cattle. For the purposes of this section bovine animals of the Galloway, Hereford, Polled Hereford, Aberdeen Angus, shorthorn (other than milking shorthorn), and Brahma breeds or crossbreeds within any of said breeds, and steers of any breed or crossbreed, including dairy breeds and crossbreeds, are not 'dairy cattle.'

"(b) Unless any such contract is recorded in accordance with subsection (d) of this section within 10 days after the contract is executed, every provision therein reserving title or property in any such chattels to the lessor after possession of the chattels is delivered to the lessee shall be void as to any purchaser, creditor or encumbrancer who, without actual knowledge of such provision, in good faith and for value purchases the chattels from the lessee or acquires a security interest therein or lien thereon by security agreement, attachment or levy, before the contract is so recorded, and as to any other creditor who, without actual knowledge of such provision, in good faith and for value becomes a creditor after possession of the chattels is delivered to the lessee and before the contract is so recorded; and as against any such purchaser, creditor or secured party title or property in any such chattels shall be conclusively presumed to have been transferred to the lessee unless the contract is so recorded.

"(c) Without limiting the generality of subsection (b) of this section, for the purposes of this section a secured party having a security interest in livestock or other animate chattels and whose security agreement provides that it shall cover any such chattels

Plaintiffs raise two contentions on appeal. First, they maintain that the trial court erred in granting summary judgment because there were justiciable issues of fact. Second, they contend that Civil Code section 2980.5 as applied to them results in an unconstitutional denial of due process. We have concluded that plaintiffs' contentions lack merit and that the judgment should be affirmed.

I

SUMMARY JUDGMENT

■ A motion for summary judgment should be granted only if all the admissible evidence contained in the declarations submitted by the parties shows that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 285 [96 Cal. Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Black* v. *Sullivan* (1975) 48 Cal.App.3d 557, 567 [122 Cal.Rptr. 119]; *Daugherty Co.* v. *Kimberly-Clark Corp.* (1971) 14 Cal.App.3d 151, 154 [92 Cal.Rptr. 120].) If there is a single material factual issue, the motion for summary judgment must be denied. (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 441 [116 P.2d 62].) ■ Affidavits of the party moving for a summary judgment are to be strictly construed, while the counteraffidavits of his opponent are to be liberally construed; all doubts as to the propriety of granting the motion are to be decided in favor of the party opposing the motion. (E.g., *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953]; *Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 436-437 [74 Cal.Rptr. 895, 450 P.2d 271]; *Loree* v. *Robert F. Driver Co.* (1978) 87 Cal.App.3d 1032, 1035 [151 Cal.Rptr. 557].)

---

subsequently acquired by the debtor shall be deemed to acquire a security interest upon any such chattels, the possession of which is thereafter delivered to the debtor under any contract as above defined, at the time possession thereof is acquired by the debtor, and such security interest shall be prior and superior to the right, title or interest of the lessor under any such contract unless the contract is recorded within 10 days after the contract is executed.

"(d) Any such contract must be acknowledged or proved and certified and must be recorded in the office of the county recorder of the county where the chattels are located at the time the contract is executed and also in the county where the lessee resides unless the lessee is a nonresident. Where the lessee is a corporation or a partnership the county of residence thereof for the purpose of recording such contract shall be deemed to be the county wherein such corporation or partnership has its principal place of business within this State."

In the instant case, plaintiffs point to two questions of fact which they maintain give rise to triable issues of material fact. First, they contend that Chase, since it arguably purchased the calves from Tiss which it contracted with Tiss to feed, was in a buyer-seller relationship with Tiss and thus not subject to the tenets of Civil Code section 2980.5. Second, they argue that since Security Pacific arguably had actual notice of their ownership interest after its discovery of Tiss' misrepresentation concerning the Tule Cattle Company calves and before sale of the remaining calves in the Tiss herd, it was not a bona fide encumbrancer entitled to take priority over their interest. Neither of these questions raises a material justiciable issue of fact.

Turning first to the issue of the nature of Chase's relationship to Tiss, whether Tiss sold the calves to Chase at some point or acted as Chase's agent in purchasing calves for it is irrelevant. If Tiss was Chase's agent, so that Chase had title to the calves from the time they were in Tiss' possession until Chase sold the cows, then the agreement between Tiss and Chase was clearly for "feeding of cattle" pursuant to Civil Code section 2980.5, subdivision (a), so that failure to record the agreement pursuant to subdivision (b) rendered the calves subject to Security Pacific's prior perfected interest pursuant to subdivision (c). If Tiss sold the calves to Chase when they were brought onto the Tiss property, so that Chase held title to the calves while Tiss was feeding them, then the agreement between Chase and Tiss was still clearly for "feeding of cattle" under the provisions of Civil Code section 2980.5. Finally, if Tiss sold Chase calves when they had been raised to a certain weight and were received by Chase for use in its operations or for further marketing, then the calves on the Tiss property at the time of Security Pacific's sale had not yet been received by Chase and were still Tiss' property and as such subject to Security Pacific's security interest in Tiss' livestock. Thus, under any of the possible interpretations of the agreement between Tiss and Chase, no justiciable issue of fact was presented.

The contention that Security Pacific's actual knowledge of plaintiffs' ownership interest in the Tiss herd at or about the time the bank foreclosed on its security presented a triable material issue is likewise without merit. Plaintiffs contend that they apprised Security Pacific of their ownership interest on the day before the bank liquidated the herd to satisfy the Tiss debt. Under the requirements of Civil Code section 2980.5, subdivisions (b) and (c), however, Security Pacific's security interest in the Tiss herd would not be defeated by actual knowledge of

another ownership interest in the herd unless that knowledge preceded its acquisition of a security interest in the herd. Plaintiffs made no showing that Security Pacific had notice of their ownership interest before it acquired a security interest in the calves. Consequently, that Security Pacific may have received notice of Calva's and Chase's ownership of the calves just prior to selling the herd is irrelevant to the outcome of the suit. (*Lawler* v. *Solus* (1951) 101 Cal.App.2d 816 [226 P.2d 348]; see, *United States* v. *Foster* (9th Cir. 1941) 123 F.2d 32.)

## II

### CONSTITUTIONALITY OF CIVIL CODE SECTION 2980.5

Plaintiffs also contend that Civil Code section 2980.5 is "subject to a constitutional 'due process' challenge." However, they do not explain exactly what kind of constitutional "challenge" they are making. As the only authority for their assertion, plaintiffs cite *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13], which dealt with procedural due process in the consumer protection posture. They apparently argue that the application of Civil Code section 2980.5 violated their right to procedural due process because it contains "no provision to afford [them] notice or opportunity to be heard prior to their loss of title or interest in their cattle." Such a challenge is clearly inapposite. Civil Code section 2980.5 is a recording statute which establishes priorities for interests in certain kinds of livestock and other animate chattels. The procedures for enforcement of a security interest are found in Chapter 5 of the Commercial Code, sections 9501-9508. Consequently, any due process challenge of the procedure used in seizing and selling the cattle after default would involve the Commercial Code sections rather than Civil Code section 2980.5. Plaintiffs, however, do not question the constitutionality of the foreclosure provisions.

■ Although plaintiffs are extremely vague and cite no pertinent authorities in their brief, their allusion to "deprivation of a significant property interest" suggests the possibility that they intended to challenge Civil Code section ·2980.5 on substantive due process grounds; that is, that in giving bona fide purchasers or encumbrancers priority over bailors of livestock who fail to record their contracts for bailment or feeding within 10 days after putting the cattle in possession of the bailee, the Legislature arbitrarily, capriciously, or irrationally deprived

the bailors of a vested right. (See, e.g., 5 Witkin, Summary of Cal. Law (8th ed. 1974) § 279 et seq., and cases cited therein.) Assuming this to be their contention, we briefly analyze the common law on bailments, the effect of recording statutes on such law, and a short commentary on the constitutionality of recording statutes.

In approaching the question of bailments, the common law has always employed the legal truism that "[o]ne who has no title to goods cannot pass title to even a bona fide purchaser." (Brown, Personal Property (2d ed. 1955) § 67, p. 231.) Thus, with certain exceptions,[6] it has been held that the bailor's title to goods takes priority over any claim of a purchaser or encumbrancer from the bailee, whether or not the purchaser or encumbrancer was aware of the prior claim at the time of the transaction. (*Id.*, at pp. 231-232, and cases cited therein.) California, like other common law jurisdictions, has applied this venerable rule in dealing with unauthorized sales of bailed goods. (E.g., *Shafer* v. *Lacy* (1898) 121 Cal. 574, 578 [54 P. 72]; *Jewelry Co.* v. *Provident Loan Assn.* (1935) 6 Cal.App.2d 506 [45 P.2d 271]; *Akron Cereal Co.* v. *First Nat. Bank* (1906) 3 Cal.App. 198, 201 [84 P. 778].)

This basic rule of law concerning the priority of claims on personalty has been altered by the Legislature in various ways. For instance, under the Uniform Commercial Code (Com. Code, § 2403), bona fide purchasers take priority.over those entrusting the possession of goods to a merchant who deals with such goods "for the purpose of sale, obtaining offers to purchase, locating a buyer, or the like; regardless of any condition expressed between the parties.…" Such legislative realignments of priorities have been justified on the theory that the bailor is estopped to assert title to goods where he or she knew that the bailee was in the business of selling such goods and thus helped to create the appearance of ownership of the goods on the part of the bailee. (See Brown, *ante,* § 71, pp. 240-246; see also Bohn & Williams, Cal. Code Comments, 23A West's Annot. Cal. Codes, pp. 384-385, "Changes from U.C.C.")

The Legislature has also altered the priority of interests in personalty through recording statutes. Those retaining title to poultry, livestock, mining or oil drilling equipment as a security device in a conditional sales contract have been required to record the contract in order to re-

---

[6]Typical exceptions to the rule of law involve transfers of money and negotiable commercial documents, voidable titles, and conditional sales. (Brown, *supra*, pp. 232-251.)

tain priority over a subsequent bona fide purchaser or encumbrancer. (Former Civ. Code, § 2980, added Stats. 1927, ch. 796, p. 1567., § 1. As amended Stats. 1931, ch. 767, p. 1607, § 1; Stats. 1933, ch. 295, p. 863, § 1; Stats. 1935, ch. 819, p. 2230, § 1; Stats. 1941, ch. 724 p. 2240, § 1; Stats. 1951, ch. 412, p. 1385, § 1; Stats. 1953, ch. 1885, p. 3679, § 1; repealed Stats. 1963, ch. 819, p. 2000, § 16, eff. Jan. 1, 1965.)[7] Bailors or lessors entering agreements "for the bailment or feeding of..." dairy cattle have been required to record their contracts so as to take priority in interest over bona fide purchasers and encumbrancers. (Civ. Code, § 2980.5, the subject of the instant case.) Such legislation establishing new priorities of interest in goods or chattels has been based on the public policy that secret liens should be avoided thereby promoting the flow of commerce by strengthening protections for business lenders. (See, e.g., *Northern Counties Bank* v. *Earl Himovitz & Sons Livestock Co.* (1963) 216 Cal.App.2d 849, 856-857 [31 Cal.Rptr. 551]; *Jewelry Co.* v. *Provident Loan Assn., supra*, 6 Cal. App.2d 506, 513; see also *Akron Cereal Co.* v. *First Nat. Bank, supra*, 3 Cal.App. 198, 201-202.)

The dairy cattle recording statute (Civ. Code, § 2980.5) has never been constitutionally challenged. However, former Civil Code section 2980, the conditional sales recording statute, had been challenged—*In re Faber* (9th Cir. 1930) 41 F.2d 726; *Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361 [5 P.2d 882]; and *Wheeler* v. *Kraner* (1937) 21 Cal.App.2d 460 [69 P.2d 881]. In *Faber* and *Seaboard*, the courts did not expressly rule on the issues of reasonable classification and substantive due process, since they found the statute as then written to be void for uncertainty. But in dicta in both cases the courts indicated that they would be inclined to find the statute neither arbitrary nor capricious, but reasonable if "intended to protect those dealing with a buyer in possession." (*Seaboard Acceptance Corp.* v. *Shay, supra*, 214 Cal. 361, 364; *In re Faber, supra*, 41 F.2d 726, 727-728.) In *Faber*, the court of appeals also stressed the wide latitude which must be given the Legislature in determining whether economic and other considerations demand legislation on a particular subject. (*In re Faber, supra*, 41 F.2d 726, 727.) In *Wheeler*, a Court of Appeal held that a later ver-

---

[7]Prior to the enactment of the Uniform Commercial Code in California, the Civil Code contained several other recording statutes altering priorities of interests in personalty. (E.g., former Civ. Code, §§ 3017-3018, requiring recordation of assignments of accounts receivable; Civ. Code, § 2957, requiring recordation of mortgages of personalty or crops.)

sion of Civil Code section 2980 was not violative of the due process clause. (*Wheeler* v. *Kraner, supra*, 21 Cal.App.2d 460, 464.)

Though the constitutionality of the dairy cattle bailment recording statute in question has not been adjudicated by an appellate court, real property recording statutes which establish similar priorities preferring bona fide purchasers and encumbrancers over those holding an earlier unrecorded title have been upheld against repeated assaults on constitutional grounds. (See, e.g., *American Land Co.* v. *Zeiss* (1911) 219 U.S. 47 [55 L.Ed. 82, 31 S.Ct. 200]; *Turner* v. *State of New York* (1897) 168 U.S. 90 [42 L.Ed. 392, 18 S.Ct. 38] *Vance* v. *Vance* (1883) 108 U.S. 514 [27 L.Ed. 808, 2 S.Ct. 854]; *Jackson* ex dem. *Hart* v. *Lamphire* (1830) 28 U.S. (3 Pet.) 280 [7 L.Ed. 679]; see also, 66 Am. Jur.2d §§ 49-50, and the numerous federal and state cases cited in footnotes therein.) For instance, in the venerable case of *Jackson* ex dem. *Hart* v. *Lamphire, supra*, 28 U.S. 280, the Supreme Court had occasion to pass on the constitutionality of a New York recording law. In responding to a challenge involving impairment of contract, the court stated: "It is within the undoubted power of State Legislatures, to pass recording acts, by which the elder grantee shall be postponed to a younger, if the prior deed is not recorded within the limited time; and the power is the same, whether the deed is dated before or after the passage of the recording act. Though the effect of such a law is to render the prior deed fraudulent and void against a subsequent purchaser, it is not a law impairing the obligation of contracts; such too is the power to pass acts of limitations, and their effect. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned. The time and manner of their operation, the exceptions to them, and the acts from which the time limited shall begin to run, will generally depend on the sound discretion of the Legislature, according to the nature of the titles, the situation of the country, and the emergency which leads to their enactment. *Cases may occur where the provisions of a law on those subjects may be so unreasonable as to amount to a denial of a right, and call for the interposition of the court; but the present is not one.*" (*Id.*, at p. 289; italics added.) Thus, the court indicated that it found no violation of substantive due process in a recording statute which preferred a later grantee over an earlier grantee who had not recorded his deed within the time limit set by the statute.

We conclude that the Legislature's economic decision that commercial lenders should be protected against secret liens and titles, especially

in a volatile market such as that involving dairy calf sales is not unreasonable, and that Civil Code section 2980.5 is not violative of substantive due process.

The judgment is affirmed.

Gardner, P. J., and McDaniel, J., concurred.