[No. D007375. Fourth Dist., Div. One. Apr. 4, 1989.]

GLENN A. DECKER, Plaintiff and Appellant, v.
CITY OF IMPERIAL BEACH, Defendant and Respondent.

COUNSEL

Schall, Boudreau & Gore, W. Lee Hill and Robert J. Trentacosta for Plaintiff and Appellant.

Hollywood & Neil and Anton C. Gerschler for Defendant and Respondent.

OPINION

KREMER, P. J.—Glenn A. Decker appeals a summary judgment in favor of the City of Imperial Beach on his complaint for the wrongful death of his son, Gary Decker. On appeal, Decker contends the court erred in finding Imperial Beach was immune from liability because the death arose out of Gary's participation in a "hazardous recreational activity" and in finding no "special relationship" existed between Gary and Imperial Beach. We conclude the trial court properly granted summary judgment and therefore affirm.

FACTS

Around 5:30 p.m. on March 15, 1984, Gary and his friend Victor Hewitt went surfing off the 1600 block of Seacoast Drive in Imperial Beach. There were no lifeguard services provided at this beach during the nonsummer months. Soon after Gary entered the water, Gary's surfboard leash became entangled in a nylon rope tether connecting a submerged lobster trap to a small floating surface buoy.

Bystanders noticed Gary appeared to be in trouble. They contacted Hewitt and called the county sheriff's department. Hewitt twice attempted to paddle out to Gary on his surfboard to render assistance, but was unable to reach him. The sheriff's department, which provided law enforcement support to Imperial Beach, called the City of Imperial Beach Fire Department to assist at the scene. Both agencies responded to the beach.[1] An announcement by bullhorn was made to Gary, telling him "help [was] on the way."

An Imperial Beach firefighter, Olin Golden, who was a water safety instructor and life guard, contacted Hewitt about the situation and

---

[1] Imperial Beach, in its brief, seems to suggest it had no liability because only county employees (i.e., sheriff department deputies) were involved. The record indicates, however, that the Imperial Beach Fire Department responded to the scene and participated in the rescue operation and that Imperial Beach contracted with the sheriff's department to provide police services to the city. Thus, liability cannot be precluded on this basis.

borrowed Hewitt's wetsuit and surfboard. Imperial Beach Fire Chief Ronald Johnston ordered Hewitt and Golden and all other would-be rescuers to remain on the beach and not to attempt a rescue.

At about 6:45 p.m., an ASTREA helicopter arrived and hovered over Gary for 15 to 20 minutes, shining a bright light on him. Eventually, a helicopter rescue was rejected. The sheriff's dive team attempted to rescue Gary by tying a rope around one diver's waist and anchoring him to the shore while he waded into the surf. There was evidence that this was an antiquated method of surf rescue that has been abandoned because it is ineffective. Shortly after this rescue attempt, Gary's surf leash became disentangled and he floated to shore, unconscious. All attempts to revive him failed. He was pronounced dead at University of California at San Diego Medical Center.

DISCUSSION

I

*Summary Judgment Standard*

■ The aim of the summary judgment procedure is to discover whether the parties possess evidence requiring the fact-weighing procedures of a trial. (*Chern* v. *Bank of America* (1976) 15 Cal.3d 866, 873 [127 Cal.Rptr. 110, 544 P.2d 1310]; *Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851 [94 Cal.Rptr. 785, 484 P.2d 953].) "[T]he trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) ■ In reviewing the propriety of a summary judgment, the appellate court must resolve all doubts in favor of the party opposing the judgment. (*Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 183 [203 Cal.Rptr. 626, 681 P.2d 893].) The reviewing court conducts a de novo examination to see whether there are any genuine issues of material fact or whether the moving party is entitled to summary judgment as a matter of law. (*Lichty* v. *Sickels* (1983) 149 Cal.App.3d 696, 699 [197 Cal.Rptr. 137].) ■ While "[s]ummary judgment is a drastic procedure, should be used with caution [citation] and should be granted only if there is no issue of triable fact" (*Brose* v. *Union-Tribune Publishing Co.* (1986) 183 Cal.App.3d 1079, 1081 [228 Cal.Rptr. 620]), it is also true "[j]ustice requires that a defendant be as much entitled to be rid of an unmeritorious lawsuit as a plaintiff is entitled to maintain a good one." (*Larsen* v. *Johannes* (1970) 7 Cal.App.3d 491, 507 [86 Cal.Rptr. 744].) "A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action

can prevail. [Citation.]" (*Molko v. Holy Spirit Assn., supra,* 46 Cal.3d at p. 1107.)

## II

### *Hazardous Recreational Activities Immunity*

■ Imperial Beach argues it has no liability for Gary's death because it arose out of Gary's participation in a "hazardous recreational activity."

Government Code[2] section 831.7 provides a public entity is not "liable to any person who participates in a hazardous recreational activity . . . for any damage or injury to property or persons arising out of that hazardous recreational activity." Surfing is specifically included as a "hazardous recreational activity." (§ 831.7, subd. (b)(3).)

Decker argues section 831.7 does not bar his suit because Gary's death was not "solely attributable" to surfing but was also due to Imperial Beach's conduct during the rescue and section 831.7 provides immunity only for injuries caused by the hazardous recreational activity itself.

■ " ' 'The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.]' " (*T.M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 277 [204 Cal.Rptr. 143, 682 P.2d 338].) "In determining such intent, the court turns first to the words of the statute." (*Regents of University of California* v. *Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 607 [224 Cal.Rptr. 631, 715 P.2d 590].) The court attempts to give effect to the usual, ordinary import of the language and seeks to avoid making any language mere surplusage. (*Fontana Unified School Dist.* v. *Burman* (1988) 45 Cal.3d 208, 219 [246 Cal.Rptr. 733, 753 P.2d 689].) The words must be construed in context in light of the nature and obvious purpose of the statute where they appear. (*Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 658-659 [147 Cal.Rptr. 359, 580 P.2d 1155].) ■ The various parts of a statutory enactment must be harmonized in context of the statutory framework as a whole. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230-231 [110 Cal.Rptr. 144, 514 P.2d 1224]; *Long Beach Police Officers Assn.* v. *City of Long Beach* (1988) 46 Cal.3d 736, 746 [250 Cal.Rptr. 869, 759 P.2d 504].) ■ The statute ". . . must be given a reasonable and common-sense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when

---

[2] All statutory references are to the Government Code unless otherwise specified.

applied, will result in wise policy rather than mischief or absurdity. [Citations.]" (*Beaty* v. *Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr 128]; see also *Webster* v. *Superior Court* (1988) 46 Cal.3d 338, 344 [250 Cal.Rptr. 268, 758 P.2d 596].)

 In defining the scope of the hazardous recreational activities immunity, the Legislature did not choose narrow language; the Legislature did not limit the immunity to injuries "solely attributable" to the hazardous recreational activity. Instead, the Legislature used expansive language to describe the scope of the immunity, stating it applied to *"any* damage or injury to property or persons *arising out of* that hazardous recreational activity." (Italics added.) This broad language is reasonably susceptible to an interpretation that it was intended to preclude liability for negligently inflicted injuries while rescuing a person who has been participating in a hazardous recreational activity since it can be said the rescue effort "arises out of" the individual's participation in the hazardous recreational activity.

Such an interpretation—that the immunity extends to rescue efforts, a foreseeable result of participating in a hazardous recreational activity—is consistent with the statutory scheme. Section 831.7 contains a number of exceptions to the rule of immunity. Subdivision (c) of section 831.7 provides: "Notwithstanding the provisions of subdivision (a), this section does not limit liability which would otherwise exist for any of the following:

"(1) Failure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose.

"(2) Damage or injury suffered in any case where permission to participate in the hazardous recreational activity was granted for a specific fee. For the purpose of this paragraph, a 'specific fee' does not include a fee or consideration charged for a general purpose such as a general park admission charge, a vehicle entry or parking fee, or an administrative or group use application or permit fee, as distinguished from a specific fee charged for participation in the specific hazardous recreational activity out of which the damage or injury arose.

"(3) Injury suffered to the extent proximately caused by the negligent failure of the public entity or public employee to properly construct or maintain in good repair any structure, recreational equipment or machinery, or substantial work of improvement utilized in the hazardous recreational activity out of which the damage or injury arose.

"(4) Damage or injury suffered in any case where the public entity or employee recklessly or with gross negligence promoted the participation in or observance of a hazardous recreational activity. For purposes of this paragraph, promotional literature or a public announcement or advertisement which merely describes the available facilities and services on the property does not in itself constitute a reckless or grossly negligent promotion.

"(5) An act of gross negligence by a public entity or a public employee which is the proximate cause of the injury.

"Nothing in this subdivision creates a duty of care or basis of liability for personal injury or for damage to personal property."

In reading the exceptions to the immunity, it is first apparent that the Legislature did not expressly exempt from the immunity liability for injuries caused by negligent rescue efforts. Liability for negligent conduct is provided for certain conduct by a public entity (failure to guard or warn of a known dangerous condition that is not reasonably assumed by a participant as an inherent part of the activity, sponsorship of a hazardous recreational activity by charging a fee, failure to maintain structures, equipment or improvements used in the activity) but not for a public entity's conduct during a rescue.

The language of subdivision (c)(5) of section 831.7 is sufficiently broad to encompass rescue activity. It states immunity is not limited for "[a]n act of *gross* negligence by a public entity or a public employee which is the proximate cause of the injury." (Italics added.) Clearly, the "act" delineated in this subdivision is not intended to duplicate those mentioned in the other immunity exemptions, i.e., a public entity's promotion or sponsorship of a hazardous recreational activity, provision of improvements or equipment, or failure to warn of known risks which are not inherently a part of the sport. Among the most obvious other "acts" which would involve a public entity with hazardous recreational activity is the act of rescuing a person who has been injured by participation in a hazardous recreational activity.

An interpretation of section 831.7 that it was intended to grant immunity for emergency rescue services unless there is gross negligence is consistent with other statutes providing immunity to persons providing emergency assistance. The Legislature has enacted numerous statutes, both before and after the enactment of section 831.7, which provide immunity to persons providing emergency assistance except when there is gross negligence. (See Bus. & Prof. Code, § 2727.5 [immunity for licensed nurse who in good faith renders emergency care at the scene of an emergency occurring outside the

place and course of nurse's employment unless the nurse is grossly negligent]; Bus. & Prof. Code, § 2395.5 [immunity for a licensed physician who serves on-call in a hospital emergency room who in good faith renders emergency obstetrical services unless the physician was grossly negligent, reckless, or committed willful misconduct]; Bus. & Prof. Code, § 2398 [immunity for licensed physician who in good faith and without compensation renders voluntary emergency medical assistance to a participant in a community college or high school athletic event for an injury suffered in the course of that event unless the physician was grossly negligent]; Bus. & Prof. Code, § 3706 [immunity for certified respiratory therapist who in good faith renders emergency care at the scene of an emergency occurring outside the place and course of employment unless the respiratory therapist was grossly negligent]; Bus. & Prof. Code, § 4840.6 [immunity for a registered animal health technician who in good faith renders emergency animal health care at the scene of an emergency unless the animal health technician was grossly negligent]; Civ. Code, § 1714.2 [immunity to a person who has completed a basic cardiopulmonary resuscitation course for cardiopulmonary resuscitation and emergency cardiac care who in good faith renders emergency cardiopulmonary resuscitation at the scene of an emergency unless the individual was grossly negligent]; Health & Saf. Code, § 1799.105 [immunity for poison control center personnel who in good faith provide emergency information and advice unless they are grossly negligent]; Health & Saf. Code, § 1799.106 [immunity for a firefighter, police officer or other law enforcement officer who in good faith renders emergency medical services at the scene of an emergency unless the officer was grossly negligent]; Health & Saf. Code, § 1799.107 [immunity for public entity and emergency rescue personnel acting in good faith within the scope of their employment unless they were grossly negligent].)

Further, there are policy reasons supporting an interpretation extending immunity to public entities for negligence occurring during the course of a rescue effort. It is a matter of strong public policy to encourage emergency assistance and rescue. Just three months after the incident involved here, the Legislature enacted Health and Safety Code section 1799.107 expressly granting immunity to emergency rescue personnel for any action taken within the scope of their employment to provide emergency services unless the personnel acted in bad faith or in a grossly negligent manner. (Health & Saf. Code, § 1799.107, subd. (b).) In enacting this statute, the Legislature declared: "The Legislature finds and declares that a threat to the public health and safety exists whenever there is a need for emergency services and that public entities and emergency rescue personnel should be encouraged to provide emergency services." (Health & Saf. Code, § 1799.107, subd. (a).)

An interpretation of the hazardous recreational activities immunity to immunize public entities and their employees for acts of emergency rescue services unless there is gross negligence furthers the strong public policy encouraging rescues and emergency assistance.

We conclude summary judgment was properly granted to Imperial Beach on Decker's cause of action for negligence.

### III

The question remains whether Decker may recover on a theory of gross negligence pursuant to subdivision (c)(5) of section 831.7.

In *Gore* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 184, 197 [167 Cal.Rptr. 881], the court examined the meaning of the term "gross negligence": "Prosser on Torts (1941) page 260, also cited by the *Van Meter* court [*Van Meter* v. *Bent Construction Co.* (1956) 46 Cal.2d 588 [297 P.2d 644]] for its definition of gross negligence, reads as follows: '*Gross Negligence.* This is very great negligence, or the want of even scant care. It has been described as a failure to exercise even that care which a careless person would use. Many courts, dissatisfied with a term so devoid of all real content, have interpreted it as requiring wilful misconduct, or recklessness, or such utter lack of all care as will be evidence of either—sometimes on the ground that this must have been the purpose of the legislature. But most courts have considered that "gross negligence" falls short of a reckless disregard of consequences, and differs from ordinary negligence only in degree, and not in kind. *So far as it has any accepted meaning, it is merely an extreme departure from the ordinary standard of care.*' (Italics added.)"

California courts require a showing of " 'the want of even scant care or an extreme departure from the ordinary standard of conduct' " in order to establish gross negligence. (*Franz* v. *Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 138 [181 Cal.Rptr. 732, 642 P.2d 792]; *De Vito* v. *State of California* (1988) 202 Cal.App.3d 264, 272 [248 Cal.Rptr. 330].) Generally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence (*Pacific Bell* v. *Colich* (1988) 198 Cal.App.3d 1225, 1240 [244 Cal.Rptr. 714]) but not always. (*De Vito* v. *State of California, supra,* at p. 272.)

Decker argues Imperial Beach is liable because their rescue personnel responded to the scene within minutes in their official capacity to give aid to Gary; they took both actual and ostensible control of the rescue efforts, they required other would-be rescuers to remain on the beach, including firefighter Golden; and "[t]he promise to 'help' arrived in the

form of the Sheriff's Department Dive Team which was not trained in surf rescue techniques" and used a technique which "was abandoned by life guards trained in surf rescue in the 1920's." Decker concludes: "Unfortunately, Gary Decker would have been better off if the City of Imperial Beach had not responded. Their presence (by creating the illusion of competent assistance and by preventing other rescue efforts) proved fatal to Gary."

### Precluding Other Assistance

The facts show Imperial Beach firefighter Olin Golden borrowed Hewitt's wet suit and requested permission to attempt a surf rescue of Gary. Decker states Golden "was a water safety instructor and a life guard trained in surf rescue." While Decker presented evidence showing Golden was a water safety instructor and lifeguard, nothing in the record indicates Golden was experienced in surf rescue. Rather, the record indicates Golden had given swimming lessons at a high school pool and had guarded the pool; this was the information known to the fire chief at the time he told Golden to stay on the beach. Under these circumstances, it cannot be said the fire chief's refusal to allow Golden to attempt a surf rescue constituted gross negligence. Sending Golden, a person not known to be trained or experienced in surf rescue, into the water could have endangered Golden's safety and been the basis for finding negligence had Golden been injured. Since the facts suggest negligence could be based on either the act or the omission, a finding of gross negligence by virtue of the omission is not warranted; the case is too closely balanced. In such a case, it cannot be said there is a " 'want of even scant care or an extreme departure from the ordinary standard of conduct.' "

This same reasoning applies even more strongly to the fire chief's refusal to allow Hewitt or other bystanders to attempt a surf rescue. Hewitt had already demonstrated his lack of qualifications to rescue Gary; he had tried twice and failed both times. ■ As to other would-be rescuers, their training and experience was unknown and it certainly cannot be said that it is gross negligence to discourage persons with unknown qualifications from attempting a dangerous surf rescue.

### Rescue Options

■ Decker presented testimony by Charles Chase, an experienced lifeguard supervisor. Chase testified about the rescue method used by the Sheriff's dive team (sending out a diver tethered to a rope) as follows: "A life line type rescue is used in special circumstances, but it would never be used with a strong side current [as was the case here] and it would never be

used if you could get there quicker in a better way, and it's a specialized form of rescue. Years and years ago the life line rescue was quite common, and that was prior to the use or the availability of, say, fins and also the availability of good swimmers. If you go back to the 20's, they had a limited amount of people that could swim as well as a lot of people can swim now and fins weren't available."

When asked why he thought the dive team was unable to reach Gary, Chase explained that "[t]he buoyancy of the full dive suit would have made it hard to submerge one's self and/or dive under the waves while you're swimming out but also slow you down." He stated the line tethering the diver to the shore would be pulled down by the side current, a "force which would impede the progress towards the rescue as far as getting to him." When asked if he had any other opinions about why the attempts to reach Gary were unsuccessful, Chase responded: "Well, it would obviously be the lack of—the dive team's lack of training in open surf conditions and what would have been a routine rescue for a lifeguard. I'd have to qualify that a little bit. The routine rescue meaning to reach the victim would have not been a difficult task at all. Whether they could have untangled the victim is —that's hard to judge from a Monday morning quarterback type of situation."

This testimony could support a finding that use of the lifeline rescue method is a disfavored surf rescue method and would not be used by an experienced, trained surf rescuer but it does not support a finding the sheriff's dive team was grossly negligent for having used this method given their lack of training or experience in surf rescue.

Nor did Decker present evidence which would support a finding Imperial Beach was grossly negligent in its selection of rescue techniques, in particular, its failure to call off-duty lifeguards trained in surf rescue for assistance.

To the extent Decker seeks to impose liability based on Imperial Beach's failure to adopt a policy requiring the training of firefighters and sheriff's deputies in surf rescue or the calling of trained lifeguards for assistance, his claim must fail. The Legislature has provided immunity to public entities for such policy decisions. (§ 820.2; *Nunn* v. *State of California* (1984) 35 Cal.3d 616, 622 [200 Cal.Rptr. 440, 677 P.2d 846].)

Nor can a finding of gross negligence be premised on the failure of the Imperial Beach rescue personnel at the beach to call for the assistance of the off-duty lifeguards. First, the facts show the rescue personnel diligently pursued attempts to rescue Gary, both by helicopter and by use of the sheriff's dive team. Decker presented no evidence contesting the validity of

decision to first attempt a helicopter rescue. He does not claim the Imperial Beach rescue personnel were grossly negligent in calling for the helicopter or attempting to effectuate a rescue by helicopter. Decker appears to treat the helicopter rescue as a valid rescue method. Second, the record shows there were no existing procedures or centralized dispatcher available for contacting off-duty lifeguards. Thus, the rescue personnel cannot be said to have been grossly negligent for having failed to follow established procedures or for having failed to pursue a readily available option (i.e., the record indicates the lifeguards were not readily and easily accessible). (Compare *Lowry* v. *Henry Mayo Newhall Memorial Hospital* (1986) 185 Cal.App.3d 188, 196, fn. 7 [229 Cal.Rptr. 620, 64 A.L.R.4th 1191] [affirming summary judgment based on immunity under Health & Saf. Code, § 1317 for a hospital rescue team because there were no facts showing bad faith or gross negligence for deviating from American Heart Association guidelines].)

Decker's argument would find gross negligence because the rescue personnel elected to try two methods to rescue Gary but failed to try a third method, i.e., contacting off-duty lifeguards. This failure to pursue this alternative, which may or may not have succeeded in saving Gary's life, does not constitute gross negligence. ■■■ To avoid a finding of gross negligence, it is not required that a public entity must pursue all possible options. It is required only that they exercise some care, that they pursue a course of conduct which is not " 'an extreme departure from the ordinary standard of conduct.' " (*Franz* v. *Board of Medical Quality Assurance, supra,* 31 Cal.3d 124, 138.)

■■■ The essence of Decker's complaint is not that the Imperial Beach rescue personnel were grossly negligent in failing to try to rescue Gary, but that they were not timely in their rescue of Gary. To the extent Decker's claim is essentially that Imperial Beach was not timely in providing lifeguard services, his case is similar to *County of Santa Cruz* v. *Superior Court* (1988) 198 Cal.App.3d 999 [244 Cal.Rptr. 105]. In the *Santa Cruz* case, the court found summary judgment was properly granted on a claim for gross negligence for injuries due to diving into shallow water. The court explained: "The only basis for liability that Magana alleged against City . . . was that City lifeguards failed to provide adequate and safe extrication and first aid to him promptly after he was injured. . . . The allegation here is that the lifeguard assigned to the area where the injury occurred did not respond and offer aid for 20 minutes. This is insufficient to raise a triable issue of gross negligence or bad faith." (*Id.* at p. 1007.)

Here the facts supporting gross negligence are even weaker. In contrast to the *Santa Cruz* case where *no* rescue efforts were made for 20 minutes, here

the rescue personnel arrived promptly and they diligently and continuously tried to rescue Gary. The facts in this case do not warrant a finding of gross negligence. Summary judgment was properly granted on Decker's cause of action for gross negligence.

## IV

### *Special Relationship*

Imperial Beach also argues it had no liability for Gary's death because no special relationship existed between Imperial Beach and Gary. We need not resolve this issue since we have held Imperial Beach has immunity under section 831.7.

### DISPOSITION

The judgment is affirmed.

Nares, J., concurred.

**WIENER, J.,** Concurring and Dissenting.—I agree that absent gross negligence, Government Code section 831.7 immunizes the City of Imperial Beach (City) from emergency rescue service. I disagree, however, that there are no triable factual issues as to the City's gross negligence.

In the interest of brevity I will not belabor what I believe is the misapplication of the standards governing summary judgment to the facts here. (See maj. opn., *ante,* pp. 353-354.) I prefer to focus on the human aspects of this case.

Understanding the meaning of gross negligence in the context of this case does not require scholarly insight into an arcane legal subject. The simple question before us is whether there are triable factual issues relating to the City's gross negligence. Significantly we are not asked to decide, as the majority would have us believe, whether Decker successfully established gross negligence. That determination is not required in a summary judgment proceeding. "[T]he trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves." (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].)

Here without sufficient factual support the majority say as a matter of law that the action taken by the fire chief to prevent any rescue effort was perfectly proper. Perhaps they are correct. It may well be that the chief made a prudent judgment call or at worse acted only negligently. But from

the information in the record before us I cannot say that this conduct did not represent a substantial departure from ordinary care. I do not know what objective criteria, if any, the fire chief used to formulate his decision barring everyone on the beach from trying to save Gary. What investigation did the fire chief take before issuing his blanket directive preventing anyone from attempting to rescue this drowning young man? What authority did he have to effectively intimidate those who were willing to be Good Samaritans from acting as such when there is nothing in this record to support a finding that their efforts would not have been successful? I would hate to think that bureaucratic considerations dominated the chief's decision. We may never know. The summary judgment remedy, characterized as a drastic remedy to be used with caution, has replaced a trial on the merits.

Although the appellate record is purportedly cold I cannot leave this case without admitting that I will remain haunted by the specter of this young man's lengthy, unsuccessful struggle against the power of the sea, fighting to stay afloat, emotionally assisted by what can only be described as a callous call from the beach that "help was on the way." In no way can this case be compared to the drowning described in *City of Santa Cruz* v. *Superior Court* (1988) 198 Cal.App.3d 999 [244 Cal.Rptr. 105] where lifeguards came to assist the victim as soon as they were able to do so, about 20 minutes after the accident occurred. All those participating in the rescue efforts were certified emergency technicians. It was also undisputed that the lifeguard assigned to the area was elsewhere properly attending to another problem when the accident happened. (At p. 1002.) I agree the facts in *City of Santa Cruz* do not present triable factual issues on the question of the City's gross negligence. I cannot agree here. This case should be decided on the evidence presented in a trial and not on the documents before us.