[No. D020748. Fourth Dist., Div. One. Sept. 6, 1994.]

In re TERRY H. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES,
Plaintiff and Respondent, v.
CHRISTOPHER H., Defendant and Appellant.

**COUNSEL**

Richard Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel, and Kathryn E. Krug, Deputy County Counsel, for Plaintiff and Respondent.

Linda M. Fabian for Minor.

**OPINION**

**KREMER, P. J.**—Christopher H. appeals the juvenile court's order declaring his minor children, Terry, Tracie, and Elizabeth H., dependents (Welf. & Inst. Code,[1] § 300, subd. (b)) and removing them from the custody of their

---

[1] All statutory references are to the Welfare and Institutions Code.

mother, Becky H. (§ 361, subd. (b)). He contends he was improperly denied reunification services.[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Terry, Tracie, and Elizabeth were born on September 15, 1988, January 24, 1990, and May 28, 1991, respectively. The family's history with child protective services comprises seven referrals beginning October 1991, including a November 1991 referral for physical abuse by Christopher.

As of October 25, 1993, Christopher and Becky had been separated a year and were in the process of divorcing.[3] The children lived with Becky, her boyfriend Gregory J., and Becky and Gregory's son David J., born May 31, 1993. Christopher lived in Long Beach with his mother and grandmother. His visits with the children were supervised by their paternal aunt, Cheryl L. Christopher said the supervision was due to his lack of an appropriate home and allegations he used drugs (he admitted smoking marijuana and drinking beer).

On October 27, 1993, the department of social services (DSS) filed dependency petitions under section 300, subdivisions (a), (b), and (d) as to Terry and subdivisions (b) and (j) as to Tracie and Elizabeth. The petitions alleged on October 22, Becky choked Terry and spanked him with a belt, the children were exposed to violence between Becky and Gregory, and the home was filthy; from January 1 to October 22, Becky used drugs to excess; and between July 1, 1992, and October 22, 1993, Gregory sexually abused Terry. The children were first detained in Hillcrest Receiving Home, then foster homes. On October 22, 1993, Becky and Gregory were arrested for child neglect and endangerment and spousal abuse and were incarcerated. On October 26, all charges were dropped.

Christopher appeared at the October 27, 1993, detention hearing. The court ordered reunification services,[4] unsupervised visitation for Christopher as arranged through DSS, and evaluation of Christopher's home and the homes of any relatives in Southern California. The court gave DSS discretion to detain the children with Christopher or a relative upon the concurrence of minors' counsel.

On November 8, 1993, Christopher appeared at the readiness hearing with his appointed attorney. The court ordered Christopher excused from trial if he gave his attorney full authority to proceed in his absence.

---

[2] Minors' appellate counsel agrees with this position.

[3] The divorce became final on December 13, 1993.

[4] The record does not specify the recipient of these services.

According to the December 21, 1993, social study, Christopher's home had not been evaluated because he was unable to care for the children. The paternal aunt's home had not been evaluated because she lived in Bakersfield and the geographical distance would make reunification difficult. Becky and Gregory were participating in reunification services. Terry had said "Chris kicked me in the peepee" and Becky asserted Christopher had kicked Terry in the groin area a few years earlier, apparently during a visit supervised by the paternal aunt. Christopher denied kicking Terry.

On December 21, 1993, Christopher entered a nolo contendere plea to the counts alleging a filthy home and Becky's drug use. The court made true findings on these counts and dismissed the remaining counts.

As of January 18, 1994, the home of paternal aunt Cheryl L. had received a positive evaluation. Becky claimed Christopher had a history of substance abuse, had failed to pay child support, and had inappropriately disciplined the children. The social worker recommended the children be returned to Becky incrementally (with Tracie and Elizabeth first) after Becky and Gregory located suitable housing, continued their successful participation in "MITE" Family Centered Services for the next two months, and had clean drug tests and means of financial support.

The contested dispositional hearing took place on February 22, 1994.[5] Christopher was present and represented by counsel. The following occurred:

"Mr. UNDERHILL [Christopher's attorney]: Your honor, before we start, there is a preliminary matter. When I was preparing for trial this morning, I noticed that there was no reunification plan created for my client. I just assumed maybe it wasn't attached to my social study. I've learned that there is no reunification plan for my client, there hasn't been one created. There should be one created before this hearing ceases, whether it is today or at a later date, so I can have an opportunity to examine the reunification and decide whether my client agrees to follow it or whether that's a contested issue. I'm sorry I didn't notice it before and I'm sorry I didn't mention it until just now, but that's the situation.

"THE COURT: Are you waiting for some wise words from me? Well, let me think of some.

"What is your client's position as to his children? Does he wish to assume custody?

---

[5]At the time of the hearing, Becky had had a positive drug test. Her sister testified about her drug use.

"MR. UNDERHILL: No. Presently, he does not.

"THE COURT: Does he wish to have reunification services?

"MR. UNDERHILL: Well, I think that he does. As his attorney, I think they should be offered to him and he should decline to accept them. First, I think we should have the department tell us what they construe reasonable reunification services to be and then he can either say that, yes, he wants to do that or he can take a no thank you position on that. But until he is offered the services I think it is premature to ask him whether he wants those or not. His situation may change in a month or two. It would not be unusual for a person his age to change their mind about this sort of thing and it may well be that reunification services would assist him, particularly counseling regarding changing his mind or being in a position to.

"THE COURT: I guess my position in these types of situations where we have a non-custodial parent who does not wish to assume custody today and doesn't tell me that he wishes to assume custody tomorrow or next week or any time soon, that I don't automatically order reunification services unless they are requested, and if they are requested, I think a non-custodial parent certainly is entitled to them, and then we need to fashion them depending on what risk factors there are.

"MR. UNDERHILL: Exactly. One of the reasons why I think it is important for a reunification plan to be drafted, it certainly cost[s] very little to draft it. The services aren't being given until they're accepted. The only reason why we need them a year down the road, it is a declaration of lack of parenting abilities, or needs a parent, and that can be an issue that comes back to be very important later on. For example, if a year down the road the father wishes to have his children, in his mind today the only problem is housing, and then a year from now the department's position is, no, there was a drug problem, there was a therapeutic problem, there were many, many problems. They are only mentioned kind of haphazardly in reunification. That ambiguity, I think, is untoward.

"THE COURT: It may. It is an interesting legal position to take, but it is a double-edged one too because I think if you take the position that renunciations, or reunification services are warranted and you want reunification services, then, at that point, the court has to take the additional steps and basically presume that there's current detriment and there's detriment because of certain risk factors which this non-custodial parent poses. Without that question being asked, it would seem we never really get to a point of making a determination of whether or not there is detriment or not detriment with this non-custodial parent. So I think it can go both ways.

"Mr. UNDERHILL: With nothing but respect to the court, I have seen reunification plans that are blank that essentially state on their face there is nothing the father or mother needs to go through, or it may be something as skimpy as visit your children and that's it. That is, in itself, an important declaration of my client's position at this point that can be used to my client's advantage later on should he wish to have the children live with him. I personally think, based on my investigation of the case, that the father needs very little in the way of services and should be ordered to comply with very little in the reunification plan, but I want the Department of Social Services to present formally their viewpoint at this stage because that's important to my client's case."

Following comment by counsel for DSS, Christopher's attorney stated: "Finally, your honor, although my client is not asking for the children to be physically given to him today, he is contemplating being [allowed] to in the future to live with the caretakers or in Bakersfield. He has no immediate plan to do that even if the children are presented to Mr. and Mrs. [L.], but he contemplates seeking permission to do that. So that puts us in a position of a quasi reunification."

Christopher's counsel later said: "My position is my client intends to live with Mr. and Mrs. [L.] in the future, probably within a year, and so because of that, I argue the court should consider his intention to do that, to be a statement for him that he intends to reunify. He is not saying today he wishes the children placed within his care and custody today or even within the next month or two. Predominantly, that's because he has no housing for them, is not set up to take the children. He, however, would indicate through counsel he feels he—there's no detriment to him as a parent having the children being placed with him. For that reason—for those reasons, the department should offer reunification services so they can—the onus can be placed on my client to even follow through with them or not follow through with them because nine months from now or six months from now if he wants to live with Mr. [L.] and Mrs. [L.], assuming the children are there, he needs to know now there may be things the court might order him to do so he can actually successfully be allowed to cohabit with the children. I'm unable to adequately advise my client about what he should do or not do to have a successful reunification with the children in the home or Mr. and Mrs. [L.] as a cohabitant until I am told what the department thinks is reasonable steps for him to undergo to get to that end."

The court stated: "[U]nless you take custody from a custodial parent, the code[] doesn't mandate offering reunification services." It noted Christopher was not a custodial parent and was not requesting custody, and the issue of

reunification services for him was nonjusticiable. The court remarked that if Christopher wanted custody, it would have to determine whether the children's placement with him would be detrimental to them, but since he was not requesting custody, it did not have to make a finding concerning detriment or identify risk factors he needed to cure in order to become an adequate parent. The court said if Christopher wanted custody, he could file a modification petition (§ 388) and the detriment issue would be addressed then. However, it was presently prepared to rule on any visitation request. Finally, the court determined because Becky was the custodial parent, reunification efforts must focus on her, and that placing the children in Bakersfield would interfere with this.

The paternal aunt testified she wanted the children placed with her. Christopher's attorney agreed. Minors' counsel concurred, unless Terry was unable to receive therapy in Bakersfield, in which case counsel requested he stay in San Diego. Attorneys for DSS and Becky asked the court to follow the social worker's recommendations.

The court found Becky and Gregory posed a substantial danger to the children's physical health if they were returned home; there were no reasonable means of protecting them without removing them (§ 361, subd. (b)(1)); the reunification plan was likely to succeed; the children were not residing with Christopher at the time the conditions underlying the dependency arose; and he did not request custody. The court declared the children dependents (§ 360, subd. (c)), removed them from Becky's custody (§ 361, subd. (b)), placed them in foster care in San Diego, and ordered Becky comply with the reunification plan.

According to the minors' brief filed June 22, 1994, Becky failed to comply with her reunification plan and the children were recently placed with their paternal aunt in Bakersfield.

DISCUSSION

Preliminarily, respondent contends Christopher has waived his right to contest the court's refusal to order reunification services by failing to make a clear request for services in the court below. We disagree. Christopher's attorney made several unambiguous and straightforward requests, quoted above, for reunification services. If the juvenile court had not understood counsel to have asked for services, it would not have denied the request. We proceed to address the merits of Christopher's arguments.

In support of his contention he was improperly denied reunification services, Christopher asserts section 361.5, subdivision (a) applies when the

court removes custody from one or both parents and places the children in out-of-home care, and entitles noncustodial parents as well as custodial parents to services. He claims the court's determination under section 361.2, subdivision (a) that noncustodial parents are not entitled to services is erroneous as that section applies only when the court removes custody from one parent and places the children with a formerly noncustodial parent who requests custody.

Section 361.5, subdivision (a) provides in pertinent part: "[W]henever a minor is removed from a parent's . . . custody, the juvenile court shall order the probation officer to provide child welfare services to the minor and the minor's parents . . . for the purpose of facilitating reunification of the family within a maximum time period not to exceed 12 months." Section 361.2, subdivision (a) states:

"When a court orders removal of a minor pursuant to Section 361, the court shall first determine whether there is a parent of the minor, with whom the minor was not residing at the time that the events or conditions arose that brought the minor within the provisions of Section 300, who desires to assume custody of the minor. If such a parent requests custody the court shall place the minor with the parent unless it finds that placement with that parent would be detrimental to the minor.

"If the court places the minor with such a parent it may do either of the following:

"(1) Order that the parent become legal and physical custodian of the child. . . .

"(2) Order that the parent assume custody subject to the supervision of the juvenile court. In such a case the court may order that reunification services be provided to the parent or guardian from whom the minor is being removed, or the court may order that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, . . ."

The basis of reunification is protecting dependent children by identifying and ameliorating the factors that placed them at risk in the home. Where the risk arose out of the action or inaction of one parent, it makes sense to provide reunification services to that parent. Where the noncustodial parent does not seek custody, there is no need to address any risks that might arise from placement with him. Here, Christopher did not request custody but

asked for a reunification plan so he could decide whether to accept it. The juvenile court, however, could not fashion a plan addressing what Christopher needed to do to reunify unless it considered whether to grant him custody, determined that awarding him custody would involve detriment to the children, identified that detriment, and decided how to address it. These inquiries would be fruitless if Christopher did not desire custody. In light of the juvenile dependency system's limited resources, it is rational to provide reunification services for those who want to reunify, and not to spend time and effort on the off chance a parent might want to assume custody at some indefinite future time.

The import of the court's comments here is not that it lacked jurisdiction to order reunification services for a noncustodial parent, but that it should order services only for a noncustodial parent who wanted custody. While Christopher wanted to defer his decision whether to seek custody, the law contemplates a request for custody, then an assessment whether custody is proper, and if not, the design of a reunification plan. Christopher failed to take the first step. However, should he now decide to seek custody and request services, there is nothing to prevent him from doing so within the time allowed for reunification.

Christopher observes the juvenile court stated noncustodial parents are entitled to services upon request and cites the statutory provision for services to parents who are incarcerated or institutionalized or whose whereabouts were formerly unknown (§ 361.5, subds. (d), (e)(1)). Taking the court's comments in isolation, it could be said the court made the remark Christopher urges. However, the court's remarks as a whole show it did not conclude noncustodial parents are always entitled to services. Furthermore, while custody must be deferred in the case of a parent who is absent, incarcerated, or institutionalized, this is a far different situation than that of a parent who is available to assume custody but unwilling to do so.

Christopher contends section 361.5 clearly mandates reunification services be provided to all parents. He points out that section provides "whenever a minor is removed from a parent's . . . custody, the juvenile court shall order the probation officer to provide child welfare services to the minor and the minor's *parents* or guardians for the purpose of facilitating reunification. . . ." (§ 361.5, subd. (a), italics added.) Relying on the use of the plural "parents," he argues the section mandates reunification services be provided to both parents and that no differentiation is made between custodial and noncustodial parents. We do not so read section 361.5, subdivision (a).

In construing a statute, we must give effect to the Legislature's intent. (*Wells Fargo Bank* v. *Superior Court* (1991) 53 Cal.3d 1082, 1095 [282 Cal.Rptr. 841, 811 P.2d 1025]; *People* v. *Freeman* (1988) 46 Cal.3d 419, 425 [250 Cal.Rptr. 598, 758 P.2d 1128].) We must construe the words of the statute "in context in light of the nature and obvious purpose of the statute where they appear. [Citation.]" (*Decker* v. *City of Imperial Beach* (1989) 209 Cal.App.3d 349, 354 [257 Cal.Rptr. 356].) We must give the statute "a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the Legislature, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. [Citation.]" (*Beaty* v. *Imperial Irrigation Dist.* (1986) 186 Cal.App.3d 897, 902 [231 Cal.Rptr. 128].)

We disagree with Christopher's assertion section 361.5 makes no differentiation between custodial and noncustodial parents. Section 361.5 is clearly directed to the custodial parent or parents. The section comes into play "whenever a minor is removed from a parent's or guardian's custody, . . ." (§ 361.5, subd. (a).) There can be no removal of custody from a parent who does not have custody in the first place. Christopher places an overly technical reliance on the use of the word "parents." When read in context and in light of the subject of the statute, it is apparent the use of the plural "parents" only reflects the fact that a child may be removed from the custody of both, rather than just one, parents, in which case reunification services should be provided to both parents. Section 361.5 is a generic statute addressing a basic situation in juvenile dependency actions, i.e., the removal of a child from the caretaker's custody and the goal of reunifying the child with the caretaker through the provision of reunification services. It does not, by its terms, encompass the situation of the noncustodial parent. Section 361.2 addresses the situation of the noncustodial parent and whether reunification services should be provided to that parent.

Christopher maintains *In re Dino E.* (1992) 6 Cal.App.4th 1768 [8 Cal.Rptr.2d 416] is dispositive. There, the father's whereabouts were unknown when the social services department filed a petition alleging the mother's mental illness and history of drug use. (*Id.* at p. 1771.) Although the father soon came forward and persisted in his desire to accept responsibility for his son, only the mother received a reunification plan. (*Id.* at pp. 1771-1774.) At the combined 12- and 18-month review hearing, the court found the father had not been provided reasonable services, but denied his request to extend reunification beyond 18 months, believing the law would not permit this. (*Id.* at pp. 1774-1775.) The reviewing court concluded the evidence supported the juvenile court's finding of inadequate services, and

that court had the discretion either to continue the 18-month review hearing on the ground the father had not been offered adequate services, or to decide the child's need for a prompt custody determination outweighed the need for a continuance to provide further services. (*Id.* at pp. 1777-1779.)

*Dino E.* does not, as Christopher intimates, hold a noncustodial parent has a right to reunification services upon request absent a concomitant request for immediate custody.[6] Thus, *Dino E.* is inapposite. We also take issue with Christopher's attempt to analogize this case to *Dino E.* on the basis both fathers wished to accept responsibility for their children but lacked suitable housing. Although Dino's father was not in a position to provide his son a home, he told the social worker he wanted to work on reuniting so his son could be placed with him. (6 Cal.App.4th at p. 1774.) Here, counsel alluded to Christopher's housing problem as an obstacle to reunification and stated his client's intent to live with the paternal aunt in the future, but noted Christopher had no immediate plan to live with her. Indeed, the aunt testified she had not talked with Christopher about the possibility of him living with her; he would not be welcome to do so at present; and before he did so he would have "to get a job and clean up his image. . . . [a]s far as his appearance." Thus, although both Dino's father and Christopher lacked suitable housing for their children, Dino's father's desire to assume responsibility for his son was unwavering with the housing problem as the only apparent obstacle, while Christopher's desire to assume custody of his children was equivocal and presented further complications. If Christopher truly wished to obtain custody, he could have sought custody and requested assistance in locating suitable housing as a part of a reunification plan. His case is not factually similar to *Dino E.*

Finally, Christopher avers the public policy of protecting children and reunifying families mandates he receive reunification services, and the denial of services violated his substantive due process right as a parent to the care, companionship, and future custody of his children. As noted above, the failure to order a reunification plan arises from Christopher's own failure to request custody, and he has not yet been precluded from seeking custody.[7] There was no due process violation or contravention of public policy.

The juvenile court did not abuse its discretion in declining to provide Christopher with a reunification plan.

---

[6]Contrary to Christopher's assertion, *Dino E.* fails to say the father there did not request custody. Although Dino's father initially wanted the child placed with relatives (6 Cal.App.4th at p. 1773), several months before the review hearing he said he wanted Dino placed with him although his home was admittedly unsuitable for a child (*id.* at p. 1774).

[7]We note the appeal in this case was largely unnecessary. If Christopher wished to have reunification services in order to reunify with his children (i.e., to have custody), he was free

DISPOSITION

Order affirmed.

Work, J., and Froehlich, J., concurred.

---

to make a motion to the juvenile court under section 388 based on changed circumstances. Indeed, the court here invited him to make such a motion should he desire custody.