Filed 1/4/22

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| AGNES NABISERE MUBANDA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SANTA BARBARA, <br><br> Defendant and Respondent. | 2d Civ. No. B303504 <br> (Super. Ct. No. 18CV00628) <br> (Santa Barbara County) |

Thirty-year-old Davies Kabogoza drowned when, while stand-up paddle boarding, he fell into the waters of the Santa Barbara Harbor (Harbor).  Agnes Nabisere Mubanda sued the City of Santa Barbara (City), which is responsible for the Harbor's regulation and administration, for the wrongful death of her son.[1]

---

[1] The two other defendants are Blue Water Boating, Inc. (Blue Water) and its manager, Skip Abed.  They are not parties to this appeal.

The City sought summary judgment based on governmental immunities, including natural condition of the Harbor (Gov. Code, § 831.2),[2] hazardous recreational activity (§ 831.7), discretionary function (§ 820.2) and primary assumption of risk.  The trial court granted the motion, concluding the City had established as a matter of law that it was immune from suit under section 831.7 because (1) Kabogoza drowned while engaging in a hazardous recreational activity and (2) plaintiff failed to raise a triable issue of material fact regarding either the immunity or its exceptions.  We affirm.

I.  FACTUAL AND PROCEDURAL BACKGROUND

The City's Waterfront Department administers all matters pertaining to the Harbor and Stearns Wharf, a municipal pier on the eastern side of the Harbor.  Scott Riedman, the City's Waterfront Director, is responsible for the overall function of the Waterfront Department.  The Santa Barbara Harbor Patrol (Harbor Patrol) is part of the Waterfront Department.  Stephen McCullough served as the Harbor Patrol's Supervisor between 2002 and 2018.

The City leases space to numerous commercial tenants who do business in the Harbor.  One such tenant is Blue Water, doing business as the Santa Barbara Sailing Center ("SBSC").  SBSC rents stand-up paddle boards (SUPs) and other watercraft to members of the public.  At the time of Kabogoza's death, SBSC was operating under a lease which required it to pay the City 10 percent of its gross receipts from rentals of non-crew operated vessels, including paddle boards.

---

[2] All statutory references are to the Government Code unless otherwise stated.

The Harbor has many longstanding artificial features, such as Stearns Wharf, the sandspit, buoys, channel markers and a dredged channel. The Harbor's most notable features are the breakwater and sandspit, which form a line on its southern side and protect the Harbor from ocean waves. The western portion of the Harbor is more protected than the eastern portion near Stearns Wharf, but the western portion is still subject to wind, choppy waves and swells. The Harbor is dredged annually to maintain a navigable depth for vessels; consequently, some areas are 30-feet deep and very cold.

The Harbor also experiences natural conditions that may pose a risk to paddle boarders, including choppy water surfaces, currents and winds that are strong enough to cause standing paddle boarders to lose their balance and fall into the water.

Recognizing that paddle boarding could be hazardous and was becoming increasingly popular in the Harbor, city officials, under Riedman's guidance, sought to minimize the risks involved. It (1) created Harbor maps illustrating some of the more protected areas of the Harbor with less vessel traffic; (2) posted signs reminding paddle boarders to stay in the "preferred paddling area"; (3) distributed hand-outs and lanyards to the rental businesses; (4) hosted meetings with Harbor tenants to discuss safe paddling practices; (5) actively patrolled the Harbor to monitor safety among paddle boarders and to notify them when unsafe practices were observed; (6) aired and posted public service announcements addressing paddle board safety; and (7) published paddle board safety tips in the City's "DockLines" newsletter.

The Harbor map warned paddle boarders to avoid the main vessel channel depicted in red and to use the preferred paddling

area in green.  The lanyards provided to SBSC and other City tenants in 2015 or 2016 were distributed as part of the Paddler Safety Program and included six bullet points:  (1) Avoid Main Channel, (2) do not cross in front of moving boats, (3) Life Jackets (PFDs) and whistles required; (4) be aware of all vessel traffic – including behind you; (5) avoid fishing lines and (6) avoid dredge and all dredge equipment.  Tenants were instructed to distribute a lanyard to each paddle board customer and to direct the customer to wear the lanyard around the neck while paddle boarding.

In the early afternoon of April 29, 2017, Kabogoza and Laura Tandy arrived at SBSC to rent paddle boards.  The pair had met the day before at a coffee shop and planned to go paddle boarding.  On the drive to the Harbor, Kabogoza told Tandy he had paddle boarded before but could not swim.  He joked "about how there were not many places to swim where he grew up in Africa."

Kabogoza initialed, signed and dated the Rental Contract/Release Agreement provided by SBSC.  His signature appears after the following acknowledgment: "I acknowledge that outdoor adventure based activities . . . could result in physical or emotional injury, paralysis, death or damage to myself, to property, or to third parties.  I understand that such risks simply cannot be eliminated without jeopardizing the essential qualities of the activity.  The risks include, among other things:  Slipping and falling; falling objects; water hazards and accidental drowning . . . . [¶]  I expressly agree and promise to accept and assume all of the risks existing in this activity.  My participation in this activity is purely voluntary, and I elect to participate in spite of the risks."

4

An SBSC employee offered Kabogoza and Tandy either a passive flotation device (a traditional nylon life vest filled with buoyant foam material) or an inflatable device (belt pack) with a pull string to inflate. The employees were familiar with Kabogoza but did not know he could not swim. Kabogoza and Tandy selected belt pack devices and an SBSC employee showed them how to operate the pull strings to deploy the inflatable personal flotation devices.

Kabogoza and Tandy launched their paddle boards and paddled through the Harbor in the direction of the sandspit. After a 20- to 30-minute stop at the sandspit, where they beached their paddle boards, they paddled towards Stearns Wharf. The wind picked up slightly, causing "small ripples" in the water. As Kabogoza and Tandy approached Buoy 6, located near Stearns Wharf, they decided to turn around and paddle back towards the Harbor. In the process of turning, Kabogoza fell off his paddle board. Tandy saw Kabogoza struggling to stay afloat. Tandy attempted to assist Kabogoza, but he was panicking and too big for her to pull to the surface. She released him when she felt herself being pulled under water.

Later that afternoon, divers recovered Kabogoza's body in approximately 35 feet of water near Buoy 6. He was pronounced dead at the scene. His uninflated belt pack was still fastened to his waist. The string on the pack had not been pulled to inflate it and the entire pack was fastened backwards with the flotation device behind Kabogoza's back instead of in the front as instructed.

## II. DISCUSSION

The City's motion for summary judgment was based on its immunity defenses. Appellant contends the City presented no

5

facts supporting these defenses.  She claims the trial court erroneously shifted the burden to her to disprove the City's defenses, improperly made inferences against her and incorrectly interpreted the governing statutes.

### A.  Standard of Review

"A defendant's motion for summary judgment should be granted if no triable issue exists as to any material fact and the defendant is entitled to a judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)"  (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003 (*Kahn*).)  A defendant meets "his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of action.  Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto."  (Code Civ. Proc., § 437c, subd. (p)(2); *Szarowicz v. Birenbaum* (2020) 58 Cal.App.5th 146, 162 (*Szarowicz*).)

"On appeal from a grant of summary judgment, we review the determination of the trial court de novo."  (*Szarowicz, supra,* 58 Cal.App.5th 162; *Kahn, supra,* 31 Cal.4th at pp. 1002-1003.)  "We strictly construe the moving party's papers and liberally construe the opposing party's papers.  We resolve any doubts as to whether there is any triable issue of material fact in favor of the opposing party."  (*Szarowicz,* at p. 162.)

### B.  *The City is Immune from Liability Under the Hazardous Recreational Activity Doctrine*

"Under the Government Claims Act . . . , a public entity is not liable '[e]xcept as otherwise provided by statute.'  [Citations.]

6

If the Legislature has not created a statutory basis for it, there is no government tort liability. [Citation.]" (*State ex rel. Dept. of California Highway Patrol v. Superior Court* (2015) 60 Cal.4th 1002, 1009, italics omitted.)

Appellant alleges statutory causes of action against the City for dangerous condition of public property, gross negligence and wrongful death. (See § 830 et seq.) She asserts "the City had the power, obligation and the opportunity to prevent, fix, guard and/or warn against the [dangerous] conditions of the Harbor," "failed to take adequate precautions to warn and/or guard against the dangerous conditions" and was grossly negligent in failing to prevent her son's wrongful death.

Section 831.7, subdivision (a) states: "Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person who assists the participant, or to any spectator who knew or reasonably should have known that the hazardous recreational activity created a substantial risk of injury to himself or herself and was voluntarily in the place of risk, or having the ability to do so failed to leave, for any damage or injury to property or persons arising out of that hazardous recreational activity." (See *Avila v. Citrus Community College Dist.* (2006) 38 Cal.4th 148, 157 (*Avila*).)

"'Hazardous recreational activity'" is defined as "a recreational activity conducted on property of a public entity that creates a substantial, as distinguished from a minor, trivial, or insignificant, risk of injury to a participant or a spectator." (§ 831.7, subd. (b).) "'Hazardous recreational activity' is further defined by a nonexclusive list of activities that qualify, including such activities as diving, skiing, hang gliding, rock climbing, and

7

body contact sports. [Citation.]" (*Avila*, *supra*, 38 Cal.4th at p. 154; § 831.7, subd. (b)(1)-(3).)

Appellant does not dispute that stand-up paddle boarding is a hazardous recreational activity. As the trial court noted, "boating" is included as a hazardous recreational activity and there is no evidence that paddle boarding is any less dangerous. Section 831.7 also includes several exceptions to hazardous recreational activity immunity. Appellant contends that the exceptions for failure to warn, gross negligence and specific payment of fees bar the application of the immunity in the present case. We disagree.

### 1. Failure to Warn

The exception for failure to warn states: "Notwithstanding subdivision (a), this section does not limit liability that would otherwise exist for any of the following: [¶] (A) Failure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose." (§ 831.7, subd. (c)(1)(A).) This section "establishes that the Legislature's aim was to withhold immunity if the public entity failed to warn or guard against a dangerous condition or hazardous activity that was not an inherent part of the activity specified in the statute. Thus, in determining whether a public entity is entitled to statutory immunity, a plaintiff's knowledge of any particular risks is irrelevant." (*Perez v. City of Los Angeles* (1994) 27 Cal.App.4th 1380, 1387 (*Perez*).)

In *Perez*, the trial court sustained the defendant's demurrer without leave to amend where the plaintiff alleged that he fell

8

and was injured while swinging from a rope hung from a tree on public property. (*Perez, supra,* 27 Cal.App.4th at pp. 1382-1383.) The Court of Appeal agreed the City of Los Angeles had no duty to guard or warn against the tree rope swinging since the plaintiff's injury had resulted from the risk of falling that was inherent in the hazardous recreational activity of tree rope swinging. (*Id.* at pp. 1383-1384; accord *Devito v. State of California* (1988) 202 Cal.App.3d 264, 272 (*Devito*).) *Perez* also explained that "if a person were to swing from a rope and jump into a body of water where, to the rope swinger's surprise, there were, for example, dangerous piranhas or crocodiles whose presence was known by the public entity, liability could be premised on the public entity's failure 'to guard or warn of a known dangerous condition.'" (*Perez,* at p. 1384.)

The same principle applies here. The risk of falling off a stand-up paddle board and drowning in a harbor is inherent in that type of hazardous recreational activity. (See *Perez, supra,* 27 Cal.App.4th at pp. 1383-1384.) As the trial court observed, "[t]here is no evidence showing that [paddle boarders] are not aware of the dangers of choppy water or inclement weather and the risk of drowning in cold ocean water. There is no evidence showing that there was a known dangerous condition of property in the area where the decedent drowned. The depth of the harbor at that point is not shown to increase the risk of drowning as opposed to the surrounding area."

### 2. Gross Negligence

The gross negligence exception to the hazardous recreational immunity doctrine provides: "Notwithstanding subdivision (a), this section does not limit liability that would otherwise exist for any of the following: [¶] . . . [¶] (E) An act of

9

gross negligence by a public entity or a public employee that is the proximate cause of the injury." (§ 831.7, subd. (c)(1)(E).) For the gross negligence exception to apply, "California courts require a showing of "'the want of even scant care or an extreme departure from the ordinary standard of conduct.'"" (*Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 358 (*Decker*).) Gross negligence is not the same as ordinary negligence, which "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 753-754 (*City of Santa Barbara*.).)

Although the determination of whether conduct constitutes gross negligence ordinarily is a question of fact (*City of Santa Barbara, supra*, 41 Cal.4th at p. 781; *Decker, supra*, 209 Cal.App.3d at p. 358), where there are no facts showing an extreme departure from the ordinary standard of conduct, the gross negligence exception to immunity fails. (*Decker*, at p. 358.) The City contends the facts supporting gross negligence in this record are nonexistent. We agree. Prior to Kabogoza's drowning in 2017, the City took many steps to promote the safety of paddle boarding within the Harbor. These included the posting of signs within the Harbor regarding preferred paddling areas, distributing maps and lanyards to paddle boarders with paddling tips, providing training to rental facilities, requiring paddle boarders to wear personal flotation devices and to have whistles, actively patrolling the Harbor for paddle boarder violations, airing and posting public service announcements regarding paddle board safety and publishing paddle boarding safety tips in a City newsletter.

10

In *Devito*, the Court of Appeal determined that the complaint failed to invoke the section 831.7, subdivision (c)(1)(E) gross negligence exception where it was alleged that the State had negligently failed to guard or warn against the known dangerous condition of the fire hose hung from a tree over a steep slope that had caused frequent serious injuries. (*Devito, supra*, 202 Cal.App.3d at pp. 267, 272.) The court reasoned that "[a] person who swings from a hose hung from a tree limb 'over a steep slope' must reasonably assume that an inherent part of the activity is the possibility of a fall down the slope from a height greater than the person's starting point on the 'ledge,'" and concluded there were "no facts showing 'an extreme departure from the ordinary standard of care.' [Citation.]" (*Id.* at p. 272; see *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1179 [demurrer sustained without leave to amend because failure to provide prompt emergency response to a 911 call -- operator put caller on hold -- did not constitute gross negligence].)

Here, the record similarly fails to show that the City engaged in the want of scant care or an extreme departure from the ordinary standard of conduct. As previously discussed, the City had no duty to guard against the known hazardous activity of paddle boarding or to warn paddle boarders, since the risk of falling off the board and drowning is an inherent risk of that activity. (*See Perez, supra*, 27 Cal.App.4th at p. 1387.)

Appellant relies upon the declaration of her aquatics safety expert, Gerald M. Dworkin, to support the "undisputed fact" that the City's conduct constitutes an extreme departure from the applicable standards of care. As the trial court observed, however, Dworkin's opinion "is simply an expert's expression of

11

his general belief as to how the case should be decided and is not admissible for that purpose." (See *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 972.)

### 3. *Specific Payment of Fees*

Section 831.7 immunity also does not apply where the governmental entity granted permission to perform the activity for a specific fee. (§ 831.7, subd. (c)(1)(B).) That exception states: "Damage or injury suffered in any case where permission to participate in the hazardous recreational activity was granted for a specific fee. For the purpose of this subparagraph, 'specific fee' does not include a fee or consideration charged for a general purpose such as a general park admission charge, a vehicle entry or parking fee, or an administrative or group use application or permit fee, as distinguished from a specific fee charged for participation in the specific hazardous recreational activity out of which the damage or injury arose." (*Ibid.*)

The City does receive a percentage of gross sales from Blue Water, but that is not the same as receiving a specific fee for permission to participate in paddle boarding or any other hazardous recreational activity. While we understand the heartbreaking nature of this case, the record confirms the trial court properly granted summary judgment based upon the City's immunity from liability under section 831.7. Appellant has failed to demonstrate the existence of a triable issue of material fact regarding the immunity's statutory exceptions.[3]

---

[3] Because the City's immunity under section 831.7 is sufficient to uphold the grant of grant summary judgment, we do not address the other possible immunities asserted by the City. Nor do we address the City's argument that gross negligence is not a distinct cause of action.

12

### III.  DISPOSITION

The judgment is affirmed.  The City shall recover its costs on appeal.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Donna D. Geck, Judge

Superior Court County of Santa Barbara

_____

Cappello & Noël, A. Barry Cappello, Leila J. Noël and David L. Cousineau, for Plaintiff and Appellant.

Cox, Wootton, Lerner, Griffin & Hansen, Terence S. Cox, Mitchell S. Griffin and Edward F. Sears, for Defendant and Respondent.

Filed 1/24/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| AGNES NABISERE MUBANDA, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SANTA BARBARA, <br><br> Defendant and Respondent. | 2d Civ. No. B303504 <br> (Super. Ct. No. 18CV00628) <br> (Santa Barbara County) <br><br> ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on January 4, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

GILBERT, P.J.          YEGAN, J.          PERREN, J.